N. KELLY HOANG LAW FIRM
N. KELLY HOANG, ESQ. (CA Bar No. 195816)
Plaza Tower
600 Anton Blvd., 11th Floor
Costa Mesa, CA 92626
Telephone: (714) 545-1016
Facsimile: (714) 545-5048
Email:  kellyhoanglaw@sbcglobal.net

Self-Representing Attorney for Plaintiff

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

| | |
|---|---|
| N. KELLY HOANG LAW FIRM and NGUYEN-HONG KELLY HOANG a.k.a. N. KELLY HOANG,<br><br>　　　　　Plaintiff,<br><br>　　vs.<br><br>MINH QUANG HOANG and DOES 1 through 20, inclusive,<br><br>　　　　　Defendants. | CASE NO.  8:21-cv-02051-JLS-DFM<br><br>**DISCLOSURE OF INITIAL EXPERT WITNESS REPORT OF GRANT D. STIEFEL FOR PLAINTIFF/COUNTER-DEFENDANT N. KELLY HOANG LAW FIRM et al.** |
| MINH QUANG HOANG,<br><br>　　　　　Counterclaimant,<br><br>　　vs.<br><br>N. KELLY HOANG LAW FIRM and NGUYEN-HONG KELLY HOANG a.k.a. N. KELLY HOANG,<br><br><br><br>　　　　　Counterdefendant. | Judge:  Honorable Josephine Staton |

Plaintiff/Counter-Defendant N. Kelly Hoang Law Firm et al. hereby discloses the initial expert witness report of Grant D. Stiefel

Dated: April 6, 2023                              **N. KELLY HOANG LAW FIRM**


By:_____
N. Kelly Hoang, Esq.
Self-Representing Attorney for Plaintiff

## EXPERT REPORT OF GRANT D. STIEFEL

I, Grant Stiefel, declare:

1.      My name is Grant Stiefel. I am a consultant and testifying expert in the field of attorneys' fees and a member of the California State Bar, as described in more detail herein. I am the principal and founder of Litigation Limited, a legal fee auditing and consulting firm. I have been retained on behalf of Plaintiff and Counter-Defendant N. Kelly Hoang, Esq., ("Plaintiff") to provide expert testimony regarding her claim for attorneys' fees.

2.      As one of the only full-time legal fee consultants in the country, I am frequently retained by litigants and law firms to proffer opinion testimony in connection with attorneys' fee disputes and/or fee-shifting motions. Over the past two decades, I have reviewed over $1 billion in law firm billings and have testified as a fee expert in state and federal courts, in JAMS and AAA arbitrations, in attorney-client fee arbitrations, and before the Court of Appeals for the Ninth Circuit. I have testified live on numerous occasions as a qualified attorney fee expert in trial courts, arbitrations, and State Bar proceedings. I have testified in tribunals across the country, including California, Texas, Washington, Pennsylvania, Nevada, Connecticut, Florida, Ohio, and Georgia.

3.      A detailed narrative of my relevant expertise and qualifications is provided at paragraphs 4 through 18 of this report, and my *curriculum vitae* is attached hereto as **Exhibit A**. My compensation in this matter is $500 per hour. I have no financial interest in the outcome of this dispute and Ms. Hoang's obligation to pay my fees is not contingent in any respect on the substance of my opinions or the ultimate determination of her claim.

## BACKGROUND AND QUALIFICATONS AS EXPERT

4.      <u>Attorney Fee Consulting Experience</u>.   I am the founder and principal of Litigation Limited, a legal auditing firm. For more than a decade, Litigation Limited has assisted corporate clients across the United States and Canada with

the review and analysis of legal invoices, the selection and management of outside counsel, and the development and implementation of outside counsel representation and billing guidelines, all with an eye toward managing and reducing overall legal spend. Litigation Limited's consulting clients include publicly traded corporations, financial institutions, and one of the largest universities in North America. As an attorney fee consultant, I help clients research and evaluate hourly rates, billing techniques, and overall billings by lawyers and law firms in many jurisdictions, from law firms both big (1,000+ lawyers) and small, and across multiple practice areas. I also help clients evaluate the efficiency and litigation strategies of their lawyers and law firms and have assisted legal departments with the implementation and management of complex, multi-jurisdictional litigation portfolios.

5.      <u>Attorney Fee Testifying Experience</u>.    I am frequently retained as an expert witness in connection with state and federal court fee disputes and attorney-client fee arbitrations, and I have testified in more than one hundred matters regarding: (i) the reasonableness of overall legal fees, (ii) the propriety of attorney billing practices, (iii) reasonable hourly rates and reasonable hours billed in the context of a lodestar analysis of damages; and (iv) litigation management issues. I have submitted expert reports and affidavits in connection with prevailing party fee requests in state and federal courts and testified in confidential attorney-client fee arbitrations. I have also been invited to testify as an expert witness in lawsuits before the Seoul High Court for the Republic of Korea (the equivalent of the Korean Court of Appeals), where I assisted the High Court in interpreting matters of California law. The Honorable Michael Paul Lindfield of the Los Angeles Superior Court noted during trial that "Mr. Stiefel's qualifications [as a testifying fee expert] cannot seriously be in dispute." *Hehir v. Kim, et. al.*, Los Angeles County Superior Court (Trial Proceedings, February 14, 2014).

6.      I work in a highly specialized niche in the legal profession, and there are probably no more than a handful of full-time attorney fee experts in the United States with knowledge, experience, specialization, and training comparable to mine. Since founding Litigation Limited over a decade ago, I have been asked to audit, review, and opine regarding invoices and billing practices of firms of all sizes, including many of the largest law firms in the world. Some of the prestigious firms who have retained me as a fee expert include Latham & Watkins, Jones Day, Orrick Herrington & Sutcliffe, McDermott Will & Emery, Loeb & Loeb, Wilson Elser, Morrison & Foerster, Fisher Phillips, Sheppard Mullin, Dykema Gossett, Strook Strook & Lavan, Buchalter Nemer, Littler Mendelson, Cappello & Noel, Reed Smith, Vedder Price, Snell & Wilmer, and Duane Morris. I have also been retained by many plaintiff's firms, class action firms, defense firms and sole practitioners.

7.      I have testified on fee issues for many well-known corporate and institutional clients, including Apple, Citibank, Wells Fargo, FitBit, Bridgestone, Beats by Dre, Verizon, Anthem Blue Cross, Los Angeles World Airports, Los Angeles Unified School District, the County of Los Angeles, and the University of Southern California, among many others. I have also been retained as a fee expert on a number of occasions by the Superior Court of California and have testified on behalf of the Superior Courts for Orange County, Santa Clara County, and Ventura County.

8.      I have testified as a live expert witness in numerous trials and arbitrations, including *SK Law Group v. PMBS*, Los Angeles County Superior Court (trial testimony); *Hehir v. Kim,* Los Angeles County Superior Court (trial testimony); *Brown v. Gilles*, ADR Services Los Angeles (arbitration testimony); *Balle v. Ross,* Nevada State Bar Proceeding (arbitration testimony); *Pintsopoulous v. WestPark Capital, et. al*., FINRA Arbitration (arbitration testimony); *Carone v. Wooley*, Santa Barbara County Bar Association Fee Arbitration (arbitration

testimony); *LegalForce v. Papiz*, JAMS Los Angeles (arbitration testimony); *Gateway Bank v. Metaxas*, JAMS San Francisco (arbitration testimony); *Joseph Aleem & Slovak v. Zaffuto* (arbitration testimony); *In re Allyne L. Urick Trust* (trial testimony); and *Cappello & Noel v. Rubin* (arbitration testimony). I have also testified in dozens of other matters as a fee expert via affidavit or declaration and have been deposed many times.

9.      Because I use a conservative and consistent court-approved methodology, I am retained as a testifying expert by both plaintiffs and defendants. To my knowledge, I am one of the only fee experts who consistently testifies for "both sides" because I use the same methodology and data sources regardless of whether I am testifying for a fee-seeking or fee-opposing party. I frequently turn down engagements where I am unable to provide counsel's hoped-for testimony—for instance, if I am asked to discount a fee request that appears reasonable to me, or if I am asked to recommend an unreasonably high hourly rate—and I have even been retained by opposing parties in the same litigation, due to my conservative and consistent methodology.[1] A list of the more than one hundred matters I have testified in as a fee expert is attached hereto as **Exhibit B**.

10.      I have never been excluded from testifying at trial as a fee expert, have never been subject to a successful *Daubert* challenge, and have never failed to qualify as an expert witness at any trial, hearing or arbitration. On the contrary, my methodology for evaluating legal billings has been approved and adopted by numerous trial courts and arbitration panels.[2] *See, e.g.*, *Courthouse News Service*

---

[1] The *Brickman* class action is illustrative: I was first retained by Defendant FitBit and then, following approval of the class action settlement and the issuance of an order awarding attorneys' fees, I was retained by Class Counsel (with FitBit's knowledge and consent) in their subsequent dispute with local counsel over allocation of the *Brickman* fees. *Brickman v. FitBit*, Case No. 3:15-cv-2077-JD (N.D. Cal.).

[2] The only time my testimony has been excluded, to my knowledge, was nearly a decade ago in connection with a 2014 Nevada fee declaration where due to counsel's inadvertence or neglect, I was not timely disclosed as an expert witness.

*v. Planet*, Case No. CV 11-08083 SJO (FFMx), October 17, 2016 Order on Attorneys' Fees (C.D. Cal.); *MMM Holdings v. Reich*, Case No. 30-2015-00822123-CU-BT-CJC, August 14, 2018 Order on Attorneys' Fees (Cal. Sup. Ct.); *Godwin v. World Healing Center Church, Inc.*, Case No. 8:21-cv-00555-JLS-DFM, October 20, 2021 Order Granting In Part Plaintiff's Motion for Attorney Fees (C.D. Cal.). I believe that trial court judges and arbitrators find my analysis to be methodologically sound, accurate, conservative, reliable, and objective.

11.      <u>Training Clients on Attorney Fee Issues and Litigation Management</u>. In addition to assisting clients on attorney fee issues and testifying as a fee expert, I have provided continuing legal education seminars on timekeeping, billing, and various litigation management issues, and have provided training to in-house counsel and legal departments on attorney fee issues. I have been approved by the California State Bar as a continuing legal education instructor on the subject of attorneys' fees (CLE provider number 16342); have lectured on attorney fee issues to CEOs, CFOs, and CIOs; and have provided training to in-house legal departments from a host of well-known corporations, including: Air France, Alcon Labs, Arch Bay Capital, Bank of America, Bank of the West, Bayer, Boy Scouts of America, Campbell Soup, Capital Power, Carlton Hotels, Chubb Insurance, CNA Insurance, ExxonMobil, Fox Broadcasting, New York Life, PacificLife, Pfizer, Purdue Pharma, Roche, Schneider Electric, Shell, Southern California Edison, SunTrust Bank, Sylvan Energy, and Wells Fargo. I also have provided CLE training on timekeeping and client billing issues to hundreds of individual lawyers, judges, arbitrators, and law firms.

12.      <u>Additional Expertise and Publications</u>.   I have been qualified as an attorney-client fee arbitrator with the State Bar of California's Attorney-Client Fee Arbitration Program through (a) the Los Angeles County Bar Association Attorney-Client Mediation and Arbitration Service and (b) the San Fernando

Valley Bar Association. I have also completed the Los Angeles County Superior Court's Temporary Judge Training Program. I have published articles in the legal and business media on attorneys' fees, billing practices, litigation management and managing outside counsel relationships, as described in my attached *curriculum vitae*. My opinions and analysis regarding hourly billing issues in the legal profession have been cited in newspapers and government reports, including the New Jersey Office of State Comptroller's *Analysis of Legal Fees Paid by New Jersey Local Governments* (June 25, 2013). I have also attended and participated in numerous seminars, conferences and continuing legal education classes on attorneys' fees and legal billing issues, and I regularly review new court opinions, practice guides and other scholarship in connection with the field of attorneys' fees.

13.     <u>Litigation Experience</u>.   Before leaving private practice to become a full-time attorney fee consultant, I was a trial lawyer with two of the world's largest law firms. From 2000 through 2004, I was a litigation associate in the Los Angeles office of Akin Gump Strauss Hauer & Feld, where I worked on complex, high-profile disputes including California's structured settlement litigation and several large consumer class actions. In 2005, I moved with a partner to the Los Angeles office of K&L Gates. Shortly thereafter, I was tasked to head up the firm's Toxic Tort Practice Group for Southern California and was lead counsel on hundreds of personal injury and wrongful death lawsuits with an aggregate settlement value of several billion dollars. Most of this high-value litigation was in the California Superior Court, where I supervised dozens of lawyers, paralegals, and staff. I was also responsible for overseeing teams of experienced trial lawyers across the country, in both their local jurisdictions and as *pro hac vice* trial counsel. As national coordinating/liaison counsel for several Fortune 500 companies, I managed local counsel and regularly reviewed, audited, and analyzed invoices from hundreds of law firms. I therefore became familiar with

timekeeping and hourly billing practices of lawyers and law firms from virtually every state, and I am perhaps the only testifying fee expert with more than a decade of experience at two global law firms.

14.   Trial Experience. I have extensive first-chair and second-chair trial experience in about two dozen trials and have tried cases to favorable verdicts. My clients (as lead trial counsel and/or counsel of record) included Schneider Electric; Crane Co.; World Wrestling Entertainment; Macquarie Bank; Samsung Electronics America; Calgon Carbon Corporation; Black Entertainment Television; TransUnion; Kia Motors; Samsung Telecommunications America; Thane International; Univar USA; and Ready Pac Produce. I have also represented smaller corporate clients and individuals (as both plaintiff and defendant) in matters that were resolved or dismissed prior to trial.

15.   Professional Associations.   During my career, I have been accepted into several professional associations that relate to my area of expertise, including the National Association of Legal Fee Analysis (NALFA) and the A.M. Best Certified Attorney Fee Practice Group. NALFA is a 501(c)(6) professional association that acts as the governing body and certifying agency for the attorney fee and legal billing profession, and its members provide a range of services on attorney fees and legal billing matters. Members of NALFA's Attorney Fee Practice Group are qualified attorney fee experts, fee dispute arbitrators, and legal bill auditors, who are retained by the nation's top law firms to provide expert reports and opinions on the reasonableness of attorney fees. I am also a longtime member of the Claims and Litigation Management Alliance (the CLM) and served on the CLM's Audit Committee and Professional Liability Committee. The CLM is a national organization that promotes and furthers the highest standards of claims and litigation management and brings together thought leaders in both industries.

16.   <u>Bar Membership and Court Admissions</u>.  I am an inactive member in good standing with the California State Bar and was admitted to practice on January 12, 2001. My state bar number is 212307, and I have no history of professional discipline. In addition to all the state courts of California, I have been admitted to the following courts: the United States Court of Appeals for the Ninth Circuit; the United States District Court for the Central District of California; the United States District Court for the Eastern District of California; the United States District Court for the Northern District of California; and the United States District Court for the Southern District of California.

17.   <u>Legal Education</u>.  I received my *juris doctor* from the University of Southern California School of Law in May 2000, where I was awarded honors or high honors in thirteen (13) subjects. I was also selected to serve as a staff editor on the honors journal, *Southern California Interdisciplinary Law Journal*, and was elected by the student body to serve on the Student Bar Association for all three years, first as Class Representative for the 1L class (1997-98) and then as Vice-President (1998-2000).

18.   <u>Undergraduate Education</u>.   I graduated from the University of Southern California in May 1994 with a Bachelor of Arts in Psychology and Linguistics, where I was a National Merit Scholar, a USC Presidential Scholarship recipient, and was named to the Dean's List for the College of Letters Arts and Sciences.

## **MATERIALS REVIEWED AND METHODOLOGY**

19.     In the process of preparing this declaration, I undertook a number of investigative steps to learn more about the underlying litigation and the attorneys claiming an entitlement to fees, as follows:

      a.  I communicated with attorney N. Kelly Hoang regarding this matter.

      b.  I accessed and reviewed the California State Bar member database (*http://members.calbar.ca.gov/fal/MemberSearch/QuickSearch*) to confirm the date of admission to the California bar and current active status for Ms. Hoang.

      c.  I reviewed Ms. Hoang's *curriculum vitae*.

      d.  I reviewed the billing records generated by Ms. Hoang in connection with the underlying litigation.

      e.  I also reviewed the following file materials from this matter:

           i.  Plaintiff's Complaint, filed on November 8, 2021, in the Superior Court of California for the County of Orange.

          ii.  Defendant's Counterclaim, filed on December 21, 2021, in the United States District Court for the Central District of California.

      f.  Finally, I reviewed the surveys, databases and legal fee matrices that are described in more detail in the following paragraphs, all of which are commonly used, cited, and relied upon by experts in this field.

20.     My opinions are informed by case law, but are based upon years of practical, real-world experience and independent research that relate to the issues that I address in this declaration. Having reviewed and audited tens of thousands of invoices from large, midsize, and small law firms in both routine litigation and major, complex disputes since 2006, I have seen just about every variation on the specific attorneys' fee and billing issues described in this declaration. I have reviewed numerous learned treatises on legal fees, hourly billing rates for lawyers

and paralegals, attorney fee awards, outside counsel management and best practices for legal billing. Finally, I reviewed the surveys and data sources that are described in more detail in the following paragraphs, all of which are commonly used, cited, and relied upon by experts in this field.

21.     It is my customary practice to offer expert opinions which are consistent, wherever possible, with judicial decisions that have addressed similar attorney's fee and billing issues. In my declaration, I generally cite to any federal and state case authorities (both reported and unpublished) and any ethical opinions which I have consulted, considered, or relied upon in forming my own opinions. I do so only so that the Court can understand how these case authorities and ethical opinions fit into my overall reasoning and form a supporting foundation for my opinions, and I am not attempting to offer "legal" opinions that are the provenance of a judge. My analysis is based upon court-approved methodologies that are widely employed by fee auditors and experts in my field.

22.     I have not been provided with or reviewed the entire case file because an in-depth review of the file was not required to complete my analysis or to render the specific conclusions and opinions expressed herein. *See, e.g., Godwin v. World Healing Center Church, Inc.*, Case No. 8:21-cv-00555-JLS-DFM, October 20, 2021, Order Granting in Part Plaintiff's Motion for Attorney Fees (overruling objections to Declarant's testimony and fee analysis because "Stiefel does not need knowledge of the underlying case to opine on counsel's billing statements; he need only have reviewed those statements and employed an appropriate and reliable methodology… The Court has reviewed Stiefel's work and finds no indicia of unreliability and takes no issue with Stiefel's methodology…"); *see also Salmon v. Davis County*, 916 P.2d 890, 898 (Utah 1996) ("An attorney need not have knowledge of the specific facts of the case to qualify as an expert" on a reasonable hourly rate). Here, my analysis and opinions would be no different even if I had reviewed every single document in the file.

## HOURLY RATE ANALYSIS

23.      In fee-shifting cases, courts award hourly rates that are consistent with rates that other attorneys of comparable skill, experience, and reputation in the relevant legal marketplace would charge for performing similar work. Thus, in my expert analysis for this declaration, I examined hourly rate data for litigators in the Los Angeles and Salt Lake City legal markets. "The party requesting the fees bears 'the burden of showing that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation.'" *United Phosphorus*, *Ltd*. *v*. *Midland Fumigant*, *Inc*., 205 F.3d 1219, 1233 (10th Cir. 2000) (quoting *Ellis v*. *University of Kan*. *Med*. *Ctr*., 163 F.3d 1186, 1203 (10th Cir. 1998)). "The focus must be on the 'prevailing market rate in the relevant community,'" and the court cannot simply "use its own knowledge to establish the appropriate rate unless the evidence of prevailing market rates before the court is inadequate." *Id*. (internal citations omitted).

24.      I have referred to the 2022 Real Rate Report by CEB/Gartner and Wolters Kluwer to evaluate the hourly rates sought by Plaintiff's counsel. The Real Rate Report, which is published biannually, provides objective hourly rate data for legal markets and practice areas, and reflects rates actually paid by clients, as opposed to the often-aspirational "rack rates" that are requested from courts in fee applications, or self-reported in surveys. *See, e.g., Hicks v. Toys 'R' Us-Delaware, Inc.,* No. CV13-1302-DSF JCGX, 2014 WL 4670896, at *1 (C.D. Cal. Sept. 2, 2014) ("Real Rate Report is "a much better reflection of true market rates than self-reported rates in all practice areas"). The data used in the Real Rate Report includes more than $155 billion in fees billed for legal services in the United States through June 2022 from the world's largest permission-based contributory data warehouse of highly detailed, anonymized invoice data showing the actual hours and fees law firm personnel billed, and was not based on surveys,

sampling, or reviews of other published surveys. A true and correct copy of the relevant portions of the 2022 Real Rate Report is attached hereto as **Exhibit C**.

25.     I believe that the Real Rate Report hourly rate data which I have used in my analysis here is objective, credible, and reliable. For more than a decade, this data has been used by top firms and experts in the field and the Real Rate Report been cited and relied upon by numerous federal and state courts in evaluating the reasonableness of hourly rates. *See Kries v. City of San Diego*, No. 18-cv-0229-GPC-BGS, at *17 (S.D. Cal. Jan. 13, 2021) ("the Court finds that the rates requested are reasonable based on previous cases and the Real Rate Report."); *Agopian v. Fed. Express Corp.*, CV 20-5282 DSF (Ex), at *3 (C.D. Cal. June 25, 2021) ("For guidance as to reasonable rates, the Court generally relies on the… Real Rate Report, a Wolters Kluwer publication, which is based on actual legal billing, matter information, and paid and processed invoices from a wide range of companies")*; Friends of the Hastain Trail v. Coldwater Dev. LLC*, Case No. BC469573, Notice of Rulings/Orders on Motion for Attorneys' Fees, p. 7 (Los Angeles County Sup. Ct. Aug. 30, 2013); *Large Audience Display Systems, LLC v. Tennman Productions, LLC*, Case No. CV 11-3398-R (C.D. Cal. June 2, 2017); *G.B. ex rel. N.B. v. Tuxedo Union Free School Dist.*, 894 F. Supp. 2d 415, 432 n.15 (S.D.N.Y. 2012); *Lewis v. Comm'r. of Soc. Sec.*, Case No. 3:09-cv-1381, Dkt. No. 31, Opinion and Order, p. 8, fn.2 (D. Or. Dec. 16, 2011). I use and rely upon the Real Rate Report in working with my consulting and expert witness clients and have found it a reliable indicator of real-world billing rates.

26.     Defendant/Counter-Claimant Minh Quang Hoang was represented in his Federal criminal cases by attorney **N. Kelly Hoang**. Ms. Hoang was admitted to the California State Bar on June 3, 1998, and has more than 24 years' experience. She is the managing partner of the N. Kelly Hoang Law Firm and has no history of professional discipline. Ms. Hoang graduated from Harvard Law School and concentrates her practice on white collar matters including Federal and

State tax criminal investigations and prosecutions, Federal and State tax civil investigations and litigation, and Federal and State white collar investigations and prosecutions including fraud investigations and prosecutions. Ms. Hoang's billable rate for this matter is $450 per hour.

27.     _Hourly Rate Analysis for the Los Angeles, CA Legal Market_:
According to the Real Rate Report data, the median market rate for a partner-level litigator in Los Angeles in 2022 was **$725 per hour**. [Real Rate Report, at p. 16]. Market rates for litigation partners in Los Angeles range from a first quartile average of **$516/hour** to a third quartile average of **$1,045/hour**. _See id._ For a partner with experience comparable to Ms. Hoang (i.e., more than two decades of experience) the median Los Angeles billable rate was **$765 per hour**. [Real Rate Report, at p. 32]. The rates for experienced Los Angeles partners range from a first quartile average of **$550/hour** to a third quartile average of **$1,133/hour**. _See id._[3]

28.     No matter how the objective Real Rate Report data is sliced, Ms. Hoang's requested hourly rate of $450 per hour is far below Los Angeles market rates. I note that many lawyers who have been awarded much higher hourly rates than Ms. Hoang's requested rate have significantly less trial experience than Ms. Hoang.[4]   I also note that an attorney's work involves much more than conducting a trial.

29.     _Hourly Rate Analysis for the Salt Lake City, UT Legal Market_:
According to the Real Rate Report data, the median market rate for a partner-level

---

[3] A white-collar criminal defense case like this would **not** require an attorney to specialize in civil trade secret litigation; I know from having worked at global law firms with both white-collar defense and IP/trade secret groups that these are two separate practice areas. On average, hourly rates for the latter specialization are significantly higher than rates for most other types of litigation work. [Real Rate Report, at p. 154].

[4] Ms. Hoang has tried three criminal trials  before a jury as a prosecutor with the U.S. Attorney's Office and the Orange County District Attorney's Office.  She has tried  six Federal tax cases, including tax fraud, in the U.S. Tax Court as a trial lawyer with the Internal Revenue Service, Office of Chief Counsel.

litigator in Salt Lake City in 2022 was **$353 per hour**. [Real Rate Report, at p. 21]. Overall, rates for litigation partners in Sant Lake City range from a first quartile rate of $246/hour to a third quartile rate of $468/hour. *See id.* For a partner-level lawyer with experience comparable to Ms. Hoang (i.e., more than 21 years' experience) the median rate was **$425 per hour**. [Real Rate Report, at p. 34]. Billable rates for comparably experienced Salt Lake City partners range from $313/hour for the first quartile rate to $515/hour for the third quartile. *See id.*

30.     Ms. Hoang's requested hourly rate of $450/hour is therefore slightly higher ($25/hour) than the median rate and $65/per hour lower than the third quartile rate for experienced partners in the Salt Lake City legal marketplace.[5] Given that Ms. Hoang obtained two favorable results in Defendant/Counter-Claimant's two criminal cases—a dismissal of the first case, and a full acquittal in the second case—I would expect an attorney of her caliber and experience to have an hourly rate that is above the median.

31.     In addition to the objective hourly rate data, I have reviewed a number of recent trial court orders from the Utah federal district court. Many fee orders from the past few years have held that a rate of $450 per hour (or higher) was reasonable for experienced partner-level lawyers practicing in the United States District Court for Utah. *See, e.g., Morrison v. Express Recovery Servs.,* No. 1:17-cv-51, at *5 (D. Utah July 7, 2020) **($450** per hour was reasonable for a 13th year California lawyer admitted *pro hac vice* to the District Court for Utah); *Utah Physicians for a Healthy Env't v. Diesel Power Gear, LLC*, 2:17-cv-00032-RJS, at *10 (D. Utah July 6, 2022) ("**$475** is a reasonable hourly rate" for partner-level work on Clean Air Act litigation); *James C. v. Aetna Health & Life Ins. Co.*, No.

---

[5] Notably, hourly rates set forth in the Real Rate Report are premised on full and prompt payment upon invoicing. If any substantial part of the payment were to be contingent or deferred for any substantial period, as is the case here, the market rate would be adjusted upward to compensate counsel for those factors.

2:18-cv-00717-DBB-CMR, at *3 (D. Utah Jan. 8, 2021) ("The court concludes that a reasonable hourly rate in this community for a highly experienced ERISA practitioner… is **$450** per hour in this case"); *Taylor v. Nat'l Collegiate Student Loan Tr. 2007-1*, No. 2:19-CV-00120-BSJ, at *12 (D. Utah Mar. 9, 2021) (approving rates of up to **$440** per hour for an "unfair debt collection case"); *Waas v. Red Ledges Land  Development, Inc.*, No. 2:20-cv-00580-TC-DBP, 2022 WL 35717, at *4 (D. Utah Nov. 2, 2021) (holding that **$650** was a reasonable hourly rate for partners to bill in Salt Lake City); *M.D. v. Anthem Health Plans of Ky.*, No. 2:17-cv-00675-JNP-CMR, at *5 (D. Utah Mar. 23, 2020) ("an hourly rate of **$450**… is appropriate in light of prevailing hourly rates for partners in Salt Lake City"); *D.K. v. United Behavioral Health & Alcatel-Lucent Med. Expense Plan*, 2:17-CV-01328-DAK, at *5 (D. Utah Sep. 7, 2021) ("**$450** per hour is a reasonable rate" for ERISA litigation in Utah); *Raymond M. v. Beacon Health Options, Inc.*, No. 2:18-cv-00048-JNP-DAO, at *6 (D. Utah Feb. 26, 2021) ("**$450** per hour is a reasonable rate"); *Sova v. Snyder*, 2:22-cv-00247-DBB-DBP, at *10 (D. Utah Oct. 4, 2022) (finding rates of up to **$585** per hour reasonable in a personal bankruptcy case).

32.     In light of the foregoing, it is my opinion that Ms. Hoang's requested hourly rate of $450 per hour is within the range of reasonable rates for comparably experienced lawyers in the Los Angeles and Salt Lake City legal markets.

33.     ___**Court Orders Approving Expert's Hourly Rate Recommendations**___: Numerous trial courts have approved my analysis and recommendations regarding reasonable hourly rates, using the same methodology and data sources referenced and used in this declaration. *See, e.g., Elmy v. Related Management Co.*, Orange County Superior Court Case No. 30-2019-01105181-CU-BT-CJC, April 4, 2022, Minute Order ("***the Court gives weight to the expert Declaration of Grant D. Stiefel on attorney fee billing***"); *Association of Independent Judicial Interpreters of California v. Sup. Ct. (Orange County)*, Orange County Superior Court Case

No. 30-2018-01024591-CU-JR-CJC, August 11, 2020 Order on Motion for
Attorney's Fees (trial court "*relied on a declaration from Stiefel*" in rejecting
counsel's above-market rates and awarded a "*reasonable rate… as reflected by
the 2018 Real Rate Report*" as recommended by Stiefel); *Vides v. ABM Janitorial
Services, Inc.*, Los Angeles Superior Court Case No. BC487930, March 25, 2016
Order on Plaintiff's Motion for Statutory Attorney Fees ("*the court agrees with
Defendant's expert Mr. Stiefel* [and] *the court finds Mr. Stiefel's declaration
persuasive as to the rates charged by comparable attorneys in Los Angeles*");
*Smith v. Related Management Co., L.P.*, Los Angeles County Superior Court Case
No. 20STCV10686, October 31, 2022 Ruling on Plaintiffs' Motion for Attorneys'
Fees (adopting Stiefel's recommended rates); *Nava vs. Related Management
Company, L.P.*, Orange County Superior Court Case No. 30-2019-01096579-CU-
BT-CJC, May 9, 2022 Minute Order (adopting Stiefel's recommended rates);
*Melendez v. Los Angeles Unified School District*, Los Angeles Superior Court
Case No. BC635349 (same); *Riskin v. Larchmont Village Property Owners Ass'n*,
Los Angeles Superior Court Case No. BS172934, November 21, 2019 Order on
Motion for Attorneys' Fees (adopting Stiefel's proposed hourly rates based on
Real Rate Report data); *Urban Pacific Construction, Inc. v. Samax Development,
LLC*, Los Angeles Superior Court Case No. EC051593, July 15, 2014 Order
Granting Motion to Declare Prevailing Parties and to Award Attorneys' Fees
(same); *Friends of the Hastain Trail v. Coldwater Development LLC*, Los Angeles
Superior Court Case No. BC469573 (August 30, 2013 Order on Motion for
Attorneys' Fees) (same).

34.     My hourly rate analysis and recommendations have also been cited,
approved, and adopted by arbitrators and administrative law judges. *See, e.g.,
Ancheta v. Verizon Wireless*, JAMS Arbitration Case No. 1110016197 (September
29, 2015 Final Arbitration Award) (adopting Stiefel's recommended hourly rates
in TCPA litigation); *Formosa v. King's Seafood Co., Inc.*, AAA Case No. 01-21-

0004-4381 (March 17, 2022 Memorandum and Order on Motion for Attorneys' Fees and Costs) (adopting Stiefel's recommended hourly rates in PAGA litigation).

///
///
///
///
///
///
///
///
///
///
///
///
///
///

## EVALUATION OF COUNSEL'S HOURLY BILLING PRACTICES

35.     Experienced attorneys know, as I do, that trials are risky and they approach trials carefully and with great consideration. One does not leap into trial without doing the appropriate discovery, motion practice, and case development, and going into a trial is a last resort. Thus, I evaluated Ms. Hoang's timekeeping and billing practices to determine whether they appear reliable on their face and comport with best practices for law firm billing, and to determine whether the time recorded appears to be reasonable. My line-by-line analysis of the subject billing records gave no indication that any specific time entries—or, for that matter, the total hours expended on the underlying litigation—are inflated or otherwise unreasonable under the circumstances.

36.     One of the most useful and widely referenced authorities on reasonable billing practices is the State Bar of California Committee on Mandatory Fee Arbitration's Advisory on Bill Padding, which was first promulgated in 2003. A true and correct copy of the most recent iteration, Arbitration Advisory 16-02, Analysis of Potential Bill Padding and Other Billing Issues (March 25, 2016) ("Bill Padding Advisory") is attached hereto as **Exhibit D**. Over the past two decades, this Bill Padding Advisory has been cited favorably by state and federal courts nationwide.[6] *See, e.g., Welch v. Metropolitan Life Ins. Co*. (9th Cir. 2007) 480 F.3d 942, 948; *Payan v. Nash Finch Co*., Case No. 11CA0570 (Co. App. 2012); *Darling Int'l., Inc. v. Baywood Partners, Inc*., 2007 WL 4532233 at * 9 (N.D. Cal. 2007); *Bonner v. Fuji Photo Film*, 2008 WL 410260 at *3 (N.D. Cal. 2008); *Apple, Inc. v. Samsung Electronics Co., Ltd*., 2012 WL 5451411 at *5 (N.D. Cal. 2012); *Yeager v. Bowlin*, Civ. No. 2:08-102 WBS JFM (E.D. Cal. April 26, 2010 Order on Motion for Attorneys' Fees); *DeCampo*

---

[6] The State Bar of California Committee on Mandatory Fee Arbitration's Arbitration Advisory 03-01, *Detecting Attorney Bill Padding*, was originally promulgated on January 29, 2003, and was superseded by the current (substantively similar) version in 2016.

*v. Potts*, Civ. No. 2:06-1283 WBS CMK (E.D. Cal. February 25, 2014 Order on Motion for Attorneys' Fees); *Ctr. for Healthcare Educ. & Research, Inc. v. Int'l Cong. for Joint Reconstruction, Inc.*, D076513 (Cal. Ct. App. Nov. 30, 2020).

37.    The Bill Padding Advisory describes numerous indicia of overbilling that "suggest padding" or are signifiers of unreliable, inflated invoices. Although not necessarily an exhaustive list, these are "red flags" that I typically look for, whether I have been hired as a consultant by a consumer of legal services to review outside counsel billings or retained as an expert witness in connection with a fee shifting motion. I conclude that the typical indicia of overbilling are not present. On the contrary, the records I reviewed comply with best practices for hourly billing and timekeeping and appear to be a reliable record of time worked by counsel.

38.    **_Counsel's invoices are not block-billed_**. First, I observe that Ms. Hoang's invoices are generally devoid of block billing. "If one amount of time is shown for working on more than one discrete task, this is called 'block billing' or 'lumping' time. This is almost never allowed by federal courts. The practice hides accountability and may increase time by 10% to 30%." [Bill Padding Advisory, at 7]. "Many sophisticated users of legal services and many courts specifically prohibit block billing, and in evaluating the appropriateness of charges for legal services it may be appropriate - even essential in some cases - to write off time and fees to account for this practice." [*Id.* at 3].

39.    Here, Ms. Hoang has described her work and accounted for each individual task and assigned a specific time value for each (i.e., task-billing), and has not resorted to block-billing. Specifically, the Court can ascertain how much time was spent on each individual task and determine whether the time spent was reasonable, particularly since each line-item billing entry contains significant detail regarding the task performed, and that there is no reason for the Court to apply an across-the-board reduction to Ms. Hoang's claim for attorneys' fees.

40.     ***Counsel's time entries are adequately detailed, and do not suffer from vagueness***.  Billing entries must be "specific enough to let the client know what was done" and failure to provide sufficient detail is often used as a basis for reducing the time requested for a particular task. [Bill Padding Advisory, at p. 10]. For instance, "[i]f one sees the exact same phrases used again and again in the bills, it is likely that some routine has set in. This may allow some 'down time' to find it[s] way into the bills. An entry such as 'review documents produced by opposition – 7.5 hours' is typical."  [*Id.*] The billing entries I reviewed here do not appear to be formulaic or duplicative (keeping in mind that there are only so many ways to describe similar, everyday tasks, and/or that a single project may legitimately take several days with the same or similar description each day).

41.     ***Counsel has properly recorded time in tenth-hour increments***. "The standard minimum is 1/10th of an hour or 6 minutes. If a higher minimum is used, such as .25 or .5, this probably increases the time by 15% to 25%. Some courts have criticized the use of a .25 or 1/4 hour minimum as being too high." [2003 Bill Padding Advisory, at p. 7]. "Courts and fee arbitrators view high incremental charges with suspicion as they may constitute an unreasonable or unconscionable fee, particularly where application of high incremental charges results in overstating the fees owed by a client." [Bill Padding Advisory, at p. 8]. *See also Morris v. Saul*, CIV 18-0164 KBM, at *9 (D.N.M. Nov. 8, 2019) ("the acceptable general practice is to accrue expended time in a given controversy in one-tenths of an hour [6 minute] increments."); *In re Tom Carter Enters., Inc.* (C.D. Cal. 1985) 55 B.R. 548, 549 ("honesty and reasonableness" requires attorney to charge clients in "one tenth of an hour" increments). Ms. Hoang properly recorded and billed time in tenth hour (i.e., six minute) increments, which is an indicium of reasonableness.

42.     ***Counsel has not estimated or "rounded up" time***. Ms. Hoang's detailed billing entries also appear to reflect the actual time spent on each discrete

task or project, as opposed to being rounded-up estimates of time, which often signify padded bills: "If the bills show time entries in whole numbers, especially large time entries such as 8.0, 9.0 or 10.0, these are probably estimates rather than actual time spent and should be scrutinized." [Bill Padding Advisory, at 8]. That is manifestly not the case here, as even the most cursory review of the subject billing records shows precise time values for each task billed, and no suspicious pattern of large, whole number billing entries.

43.     ***Counsel has not included charges for overhead, administration, or
secretarial tasks.*** "[O]verhead expenses are a cost of doing business [that] should
be reflected in the hourly rates [and] should not be passed on to the client…" [Bill
Padding Advisory, at p. 11]. Thus, it is "inappropriate to allow a lawyer to also
charge a client his/her hourly rate for doing secretarial work." *Id; see also Ramos
v. Lamm*, 713 F.2d 546, 554 (10th Cir. 1983). The billing records I reviewed do
not appear to reflect any impermissible charges for office overhead or
administration.

44.     ***Counsel recorded her time contemporaneously***. One of the reasons
that Ms. Hoang's time entries are so detailed—and therefore appear to be a
credible record of time worked—is that the majority of billing entries were
recorded contemporaneously: "Was the invoice [or time entry] prepared at or near
the time when the services were provided? [I]f too much time has elapsed between
the event and generating the invoice, the times shown might be estimates or best
guesses of the time involved." [Bill Padding Advisory, at p. 8]. I am informed by
Ms. Hoang that she typically recorded her billing entries on a daily basis, and that
in most instances she tracked and recorded her time using a stopwatch timer.

I declare under penalty of perjury under the laws of the United States of
America that the foregoing is true and correct. Executed this 6th day of April
2023, at Denver, Colorado.


_____
        Grant D. Stiefel

# PROOF OF SERVICE

*N. Kelly Hoang Law Firm, et al. vs. Minh Quang Hoang*

**CENTRAL DISTRICT OF CALIFORNIA Court Case No. 8:21-cv-02051**

I, the undersigned, declare that:

I am and was at the time of service of the papers herein, over the age of eighteen (18) years and am a party to the action. I am employed in the County of Orange, California, and my business address is 600 Anton Blvd., Costa Mesa, CA 92626.

On **April 6, 2023,** I caused to be served the following document:

**DISCLOSURE OF INITIAL EXPERT WITNESS REPORT OF GRANT D. STIEFEL FOR PLAINTIFF/COUNTER-DEFENDANT N. KELLY HOANG LAW FIRM et al.**

**BY ELECTRONIC DELIVERY:** Based on an agreement between the parties to accept service by e-mail or electronic transmission, I caused such document(s) to be electronically served to those parties listed below from e-mail address kellyhoanglaw@sbcglobal.net. The file transmission was reported as complete and a copy of the Service Receipt will be maintained with the original document(s) in our office.

Christina G. Bernstein, Esq.:

christina@garciahonglaw.com

Mark Fleming, Esq.:

mark@markfleminglaw.com

I declare under penalty of perjury that the foregoing is true and correct. Executed on **April 6, 2023** at Orange County, California.

/s/ *N. Kelly Hoang*

N. Kelly Hoang, Esq.

# EXHIBIT A
## (TO EXPERT WITNESS REPORT OF GRANT D. STIEFEL)

# GRANT STIEFEL, ESQ.

## ATTORNEY FEE CONSULTANT

424.223.8252 

grant@litigationlimited.com 

grantstiefel.com 

Los Angeles CA | Denver CO 

## EDUCATION

### UNIVERSITY OF SOUTHERN CALIFORNIA SCHOOL OF LAW
J.D. 2000

*Highest Honors*: Law, Language & Ethics; Copyright Law; Constitutional Law II

*Honors*: Constitutional Law, Professional Responsibility, Real Estate Transactions, Business Organizations, Criminal Law, Pre-Trial Advocacy; Taxation; Corporate Crime Seminar; Directed Research; Dissertation

*Honors Journal*: Staff Editor, *Southern California Interdisciplinary Law Journal*

*Elected by Student Body*: Vice-President, Student Bar Association (1998-2000), Class Representative (1997-98)

### UNIVERSITY OF SOUTHERN CALIFORNIA
Psychology & Linguistics B.A. 1994

*Honors*: Presidential Scholar (1990-94), National Merit Scholar (1990-94), Dean's List (1990-1994)

## PROFESSIONAL EXPERIENCE

### LITIGATION LIMITED
Los Angeles, California and Denver, Colorado (2012-Present)

**Grant Stiefel, Esq**. is an attorney fee consultant, testifying expert and the principal of Litigation Limited, a boutique legal auditing firm. Mr. Stiefel has assisted clients and courts nationwide by providing expert trial testimony on legal fee issues, including the reasonableness of legal fees:

- Mr. Stiefel has qualified and testified as a legal fee expert in **over 100 lawsuits**, including disputes in federal district courts, California trial courts, JAMS/AAA arbitrations, State Bar court, and attorney-client fee arbitrations

- His methodology for reviewing, auditing and evaluating legal invoices has been **cited, approved and adopted by state and federal courts**

- Mr. Stiefel is a member of the California State Bar (inactive) and is unique among fee experts in that he was a trial attorney for more than a decade at two of the world's largest law firms

- Because he uses **consistent, court-approved methodologies**, Mr. Stiefel is able to effectively testify on behalf of fee-seeking or fee-opposing parties

As an independent fee auditor and consultant, Grant Stiefel also assists corporate clients with the review and management of law firms and fees:

- Mr. Stiefel advises clients on the selection and management of counsel for complex, multi-jurisdictional litigation and has audited hundreds of millions of dollars in legal fees

- He helps clients develop and implement outside counsel guidelines and internal auditing procedures

- Mr. Stiefel is a California State Bar-approved continuing legal education instructor on attorneys' fees issues who has trained hundreds of executives and in-house lawyers on legal fee issues

# GRANT STIEFEL, ESQ.

## ATTORNEY FEE CONSULTANT

## BAR ADMISSIONS

State of California (*inactive*)

Ninth Circuit Court of Appeals

Northern District of California

Southern District of California

Eastern District of California

Central District of California

## PROFESSIONAL AFFILIATIONS & CERTIFICATIONS

National Association of Legal Fee Analysts

Claims and Litigation Management Alliance
Professional Liability Committee
Audit Committee

California State Bar Attorney-Client Fee Arbitrator
Los Angeles County Bar Assn.
San Fernando Valley Bar Assn.

A.M. Best Certified Attorney Fee Practice Group

California State Bar Certified CLE Provider
Provider No. 16342

## PROFESSIONAL EXPERIENCE [CONTINUED]

### K&L GATES LLP
#### Los Angeles, California (2004-2012)
Head of Southern California Toxic Tort Defense Practice
Senior Associate / Associate

- Headed the Southern California toxic tort defense practice for the world's fifth-largest law firm

- Counsel of record and lead trial counsel on hundreds of eight-figure personal injury and wrongful death claims

- Supervised and managed a multi-jurisdictional litigation portfolio with an aggregate settlement value of over $3 billion

- Obtained favorable jury verdicts and dismissals as first and second chair trial counsel

- Supervised teams of lawyers and law firms across the nation as coordinating counsel for multi-jurisdictional litigation

- Reviewed millions of dollars in fees and costs on a monthly basis from dozens of law firms and offices

- Trained lawyers, paralegals and staff in ethical billing practices

- Developed custom case management, billing and calendaring systems for Fortune 500 clients

- Successfully argued dozens of motions to dismiss and motions for summary judgment in high-value cases

- Defended multi-state Attorneys General investigation

- Litigated motions for attorneys' fees

- Representative clients (as lead trial counsel/attorney of record) included Schneider Electric, Crane Co., World Wrestling Entertainment, Macquarie Bank, Samsung Electronics America, Calgon Carbon Corporation, Black Entertainment Television and TransUnion

# GRANT STIEFEL, ESQ.

## ATTORNEY FEE CONSULTANT

### REPRESENTATIVE LAW FIRM CLIENTS

Reed Smith

McDermott Will and Emery

Jones Day

Sidley Austin

Dykema Gossett

Orrick Herrington & Sutcliffe

Littler Mendelson

Cappello & Noel

Overton Lyman & Prince

Morrison & Foerster

Buchalter

Stroock Stroock & Lavan

Vedder Price

Duane Morris

Loeb & Loeb

### REPRESENTATIVE CORPORATE CLIENTS

Apple

Citibank NA

Aegon USA

Transamerica Corporation

One West Bank

AstraZeneca Pharmaceuticals

Verizon Wireless

East West Bank

Wells Fargo

JAKKS Pacific

University of Alberta

SEACOR

Heidelberg USA

Sinclair Broadcasting

Capital Power

New Hampshire Insurance Co.

Kaiser Health

Beats by Dre

Los Angeles Times

## PROFESSIONAL EXPERIENCE [CONTINUED]

### AKIN GUMP STRAUSS HAUER & FELD, LLP
*Los Angeles, California, 1999-2004*
Associate Attorney

- Defended consumer class actions, unfair competition and antitrust claims, including California's *In re Structured Settlement Litigation*

- Drafted and argued numerous successful summary judgment motions, motions for attorneys' fees, anti-SLAPP motions, discovery motions and motions to dismiss

- Representative clients included Kia Motors, Samsung Telecommunications America, Thane International, Univar USA and Ready Pac Produce

## PUBLICATIONS AND PRESENTATIONS

- "Recent Developments in Block Billing"
  *J.D. Supra* (article)

- "Ten Things You Need to Know About Law Firm Billing"
  (article, live seminars and online presentations)

- "The Client's Guide to Law Firm Billing"
  *HG Experts* (article)

- California State Bar MCLE Presentations on Law Firm Billing
  (live seminars and online presentations)

- "Analysis: John Doe No. 1 v. Patrick Cahill and Julia Cahill"
  *e-Commerce Law Reports*, Volume 5, Issue 6
  (article)

## PERSONAL

Grant Stiefel lives in Colorado with his wife and dogs. Before law school, in the days of analog, he was a professional songwriter, producer and musician.

# EXHIBIT B
# (TO EXPERT WITNESS REPORT OF GRANT D. STIEFEL)

## **LIST OF PRIOR TESTIMONY**

| CASE NAME | COURT/PANEL | NATURE OF TESTIMONY |
|---|---|---|
| *United National Insurance Company v. Bass Underwriters* | State of Pennsylvania Common Law Arbitration | Expert testimony on behalf of fee-opposing party |
| *Chang & Cote v. WHPM Inc.* | Superior Court of the State of California for the County of Los Angeles | Expert testimony on behalf of fee-opposing party |
| *Nouveau v. Disguise* | Superior Court of the State of California for the County of Los Angeles | Expert testimony on behalf of fee-seeking party |
| *American Express Bank v. Sobelsohn* | Superior Court of the State of California for the County of Los Angeles | Expert testimony on behalf of fee-seeking party |
| *Wong v. HRJ Capital BD* | Superior Court of the State of California for the County of Santa Clara | Expert testimony on behalf of fee-opposing party |
| *SK Law Group v. PMBS* | Superior Court of the State of California for the County of Los Angeles | Expert trial testimony on behalf of fee-opposing party |
| *Tallman v. CPS* | United States District Court for the District of Nevada | Expert testimony on behalf of fee-opposing party |
| *Kwang Kang v. Ha-Yeong Kim* | Honorable Seoul Central District Court (Korea) | Expert testimony regarding California law (in Korean dispute applying CA law) |
| *Garnet Analytics v. Diversified Solutions* | United States District Court for the District of Connecticut | Expert testimony on behalf of fee-opposing party |
| *Rodriguez v. Arter* | Superior Court of the State of California for the County of Los Angeles | Expert testimony on behalf of fee-opposing party |

| CASE NAME | COURT/PANEL | NATURE OF TESTIMONY |
|---|---|---|
| *Sheikh v. East West Bank* | United States District Court for the District of Central District of California | Expert testimony on behalf of fee-opposing party |
| *Hunter v. Fisher* | Superior Court of the State of California for the County of Los Angeles | Expert testimony on behalf of fee-opposing party |
| *Urban Pacific Construction v. Samax Development* | Superior Court of the State of California for the County of Los Angeles | Expert testimony on behalf of fee-seeking party |
| *Kern Water Bank Authority v. Grayson Service* | Superior Court of the State of California for the County of Kern | Expert testimony on behalf of fee-opposing party |
| *Kirk v. First American Title Company* | Superior Court of the State of California for the County of Los Angeles | Expert testimony on behalf of fee-seeking party |
| *Cuevas v. Mortgage Capital Partners* | ADR Arbitration (Los Angeles) | Expert testimony on behalf of fee-opposing party |
| *F&F LLC v. East West Bank* | Superior Court of the State of California for the County of Los Angeles | Expert testimony on behalf of fee-opposing party |
| *Chavarra v Benihana National Corp.* | United States District Court for the District of California | Expert testimony on behalf of fee-seeking party |
| *Kuba v. Fairclough* | Superior Court of the State of California for the County of Los Angeles | Expert testimony on behalf of fee-opposing party |
| *Oliver v. Astrazenca Pharmaceuticals* | United States Court of Appeals for the Ninth Circuit | Expert affidavit on behalf of fee-seeking party |
| *Schweitzer v. Post Advisory Group* | AAA Arbitration (Los Angeles) | Expert testimony on behalf of fee-opposing party |

| CASE NAME | COURT/PANEL | NATURE OF TESTIMONY |
|---|---|---|
| *Kwang Kang v. Sunsa Kim* | Seoul Central District Court (Korea) | Expert testimony regarding California law (in Korean dispute applying CA state law) |
| *Hehir v. Kim* | Superior Court of the State of California for the County of Los Angeles | Expert trial testimony on behalf of fee-opposing party |
| *Balle v. Ross* | State Bar of Nevada Attorney-Client Fee Arbitration | Expert testimony on behalf of fee-opposing party |
| *Gallimore v. Kaiser Foundation Health Plan* | Superior Court of the State of California for the County of Alameda | Expert testimony on behalf of fee-opposing party |
| *Ancheta v. Verizon Wireless* | JAMS Arbitration (San Jose) | Expert testimony on behalf of fee-opposing party |
| *Anhing v. Thuang Phong Company* | United States District Court for the Central District of California | Expert testimony on behalf of fee-seeking party |
| *Jones v. Wells Fargo* | United States District Court for the Central District of California | Expert testimony on behalf of fee-seeking party |
| *Vides v. ABM Janitorial Services* | Superior Court of the State of California for the County of Los Angeles | Expert testimony on behalf of fee-opposing party |
| *Flores v. AHMC Monterey Park Hospital* | Superior Court of the State of California for the County of Los Angeles | Expert testimony on behalf of fee-opposing party |
| *Investors Warranty of America v. Chicago Title Insurance Company* | Superior Court of the State of California for the County of Orange | Expert testimony on behalf of fee-seeking party |

| CASE NAME | COURT/PANEL | NATURE OF TESTIMONY |
|---|---|---|
| *Gateway Bank v. Metaxas* | Superior Court of the State of California for the County of San Mateo | Expert trial testimony on behalf of fee-seeking party |
| *Paskenta Band of Nomlaki Indians v. Crosby* | United States District Court for the Eastern District of California | Expert testimony on behalf of fee-seeking party |
| *McLaughlin v. Wells Fargo Bank* | United States District Court for the Northern District of California | Expert testimony on behalf of fee-opposing party |
| *John Russo Industrial Sheetmetal Inc. v. City of Los Angeles Department of Airports et al.* | Superior Court of the State of California for the County of San Mateo | Expert testimony on behalf of fee-opposing and fee-seeking party |
| *Flores v. Brown* | Superior Court of the State of California for the County of Orange | Expert testimony on behalf of fee-seeking party |
| *Blanda v. Martin & Seibert* | United States District Court for the Southern District of West Virginia | Expert testimony on behalf of law firm in whistleblower suit/federal investigation |
| *Natural-Immunogenics v Newport Trial Group* | United States District Court for the Southern District of California | Expert testimony on behalf of fee-opposing party |
| *Buckley v. Penny Mac* | Superior Court of the State of California for the County of Los Angeles | Expert testimony on behalf of fee-opposing party |
| *Morton v. First American Title Insurance Company* | Superior Court of the State of California for the County of Los Angeles | Expert testimony on behalf of fee-seeking party |
| *Maus v. Tamraz* | Los Angeles County Bar Association Attorney-Client Fee Arbitration | Expert testimony on behalf of fee-opposing party |

| CASE NAME | COURT/PANEL | NATURE OF TESTIMONY |
|---|---|---|
| *Dignity Health v. LA Care Health Plan* | Superior Court of the State of California for the County of Los Angeles | Expert testimony on behalf of fee-opposing party |
| *Civic Financial Services v. Torres* | Superior Court of the State of California for the County of Orange | Expert testimony on behalf of fee-opposing party |
| *Precision Industrial v. New Hampshire Insurance Company* | United States District Court for the Western District of Washington | Expert testimony on behalf of fee-opposing party |
| *Jibe Audio v. Iovine* | Superior Court of the State of California for the County of Los Angeles | Expert testimony on behalf of fee-opposing party |
| *Brown v. Gilles* | ADR Arbitration (Los Angeles) | Expert trial testimony on behalf of fee-opposing party |
| *JFK Memorial Hospital v. Access Nurses* | Superior Court of the State of California for the County of Riverside | Expert testimony on behalf of fee-seeking party |
| *MMM Holdings v. Reich* | Superior Court of the State of California for the County of Orange | Expert testimony on behalf of fee-opposing party |
| *Carone v. Wooley* | Santa Barbara County Bar Association Mandatory Fee Arbitration | Expert trial testimony on behalf of fee-opposing party |
| *Morales v. Bridgestone* | Superior Court of the State of California for the County of Orange | Expert testimony on behalf of fee-opposing party |
| *Brickman v. FitBit* | United States District Court for the Northern District of California | Expert testimony on behalf of fee-opposing party |
| *LegalForce v. Papiz* | JAMS Arbitration (Los Angeles) | Expert trial testimony on behalf of fee-opposing party |

| CASE NAME | COURT/PANEL | NATURE OF TESTIMONY |
|---|---|---|
| *Lombardi v. Lombardi* | Superior Court of the State of California for the County of Los Angeles | Expert testimony on behalf of fee-opposing party |
| *Navarro v. Hudson* | Superior Court of the State of California for the County of Riverside | Expert testimony on behalf of fee-opposing party |
| *Melendez v. Los Angeles Unified School District* | Superior Court of the State of California for the County of Los Angeles | Expert testimony on behalf of fee-seeking party |
| *Department of Fair Employment & Housing v. M&N Financing Corp.* | Superior Court of the State of California for the County of Los Angeles | Expert testimony on behalf of fee-opposing party |
| *Mills v. Melone* | Superior Court of the State of California for the County of Los Angeles | Expert testimony on behalf of fee-seeking party |
| *In re Estate of Thomas* | Superior Court of the State of California for the County of Orange | Expert testimony on behalf of fee-opposing party |
| *LegalForce v. LegalZoom* | AAA Arbitration (San Francisco) | Expert testimony on behalf of fee-opposing party |
| *Riskin v. Larchmont Property Association* | Superior Court of the State of California for the County of Los Angeles | Expert testimony on behalf of fee-seeking party |
| *Correia v. Peak Campus California* | Superior Court of the State of California for the County of Los Angeles | Expert testimony on behalf of fee-seeking party |
| *Pintsopoulos vs. WestPark Capital Inc.* | FINRA Arbitration (Florida) | Expert trial testimony on behalf of fee-opposing party |
| *Coffee+Food LLC v. Leonian* | Superior Court of the State of California for the County of Los Angeles | Expert testimony on behalf of fee-seeking party |

| CASE NAME | COURT/PANEL | NATURE OF TESTIMONY |
|---|---|---|
| *Aetna v. KCC Class Action Services* | United States District Court for the Central District of California | Expert testimony on behalf of fee-opposing party |
| *Canizales v. The Pep Boys - Manny Moe & Jack of California* | AAA Arbitration (Los Angeles) | Expert testimony on behalf of fee-seeking party |
| *Casillas v. Workforce Solutions* | United States District Court for the Central District of California | Expert testimony on behalf of fee-opposing party |
| *Association of Independent Judicial Interpreters of California v. Superior Court of California for Orange County* | United States District Court for the Central District of California | Expert testimony on behalf of fee-opposing party |
| *Chavez v. Lifetech Resources* | Superior Court of the State of California for the County of Los Angeles | Expert testimony on behalf of fee-seeking party |
| *Skylight Advisors v. Zephyr Investment* | Superior Court of the State of California for the County of Los Angeles | Expert testimony on behalf of fee-opposing party |
| *Woodall v. Woodall* | Superior Court of the State of California for the County of Orange | Expert testimony on behalf of fee-opposing party |
| *Taggares v. Burrows* | JAMS Arbitration (Los Angeles) | Expert testimony on behalf of fee-opposing party |
| *Joseph Aleem & Slovak v. Zaffuto* | Los Angeles County Bar Association Mandatory Fee Arbitration | Expert trial testimony on behalf of fee-seeking party |
| *Blum Collins v. Sasson* | Superior Court of the State of California for the County of Los Angeles | Expert testimony on behalf of fee-opposing party |

| CASE NAME | COURT/PANEL | NATURE OF TESTIMONY |
|---|---|---|
| *Edwards v. RMO* | Los Angeles County Bar Association Mandatory Fee Arbitration | Expert testimony on behalf of fee-seeking party |
| *In re Williams Family Trust* | Superior Court of the State of California for the County of Orange | Expert testimony on behalf of fee-seeking party |
| *Air Combat USA v. O'Reilly* | Superior Court of the State of California for the County of Orange | Expert testimony on behalf of fee-seeking party |
| *North American Title Insurance Company v. Napean Capital Group* | Superior Court of the State of California for the County of Los Angeles | Expert testimony on behalf of fee-seeking party |
| *Fernandez v. Arm & J* | ADR Arbitration (Los Angeles) | Expert testimony on behalf of fee-seeking party |
| *In re Allyne L. Urick Trust* | Superior Court of the State of California for the County of Orange | Expert trial testimony on behalf of fee-seeking party |
| *Kithas v. Dworken & Bernstein* | AAA Arbitration (Ohio) | Expert trial testimony on behalf of fee-seeking party |
| *Lieberg v. Kanter* | Superior Court of the State of California for the County of Riverside | Expert testimony on behalf of fee-seeking party |
| *Rueda v. Pacquiao* | Superior Court of the State of California for the County of Los Angeles | Expert testimony on behalf of fee-opposing party |
| *Colliers v. Mattress Firm* | United States District Court for the Northern District of Georgia | Expert deposition testimony on behalf of fee-opposing party |
| *Simerly v. Children's Hospital of Los Angeles* | Signature Resolution Arbitration (Los Angeles) | Expert testimony on behalf of fee-opposing party |

| CASE NAME | COURT/PANEL | NATURE OF TESTIMONY |
|---|---|---|
| *In re Mark Hughes Family Trust* | Superior Court of the State of California for the County of Los Angeles | Expert deposition testimony on behalf of fee-opposing party |
| *Anabi Oil Corp. v. IFuel* | Superior Court of the State of California for the County of Los Angeles | Expert testimony on behalf of fee-seeking party |
| *Gerardi v. Redlands Ford* | AAA Arbitration (Los Angeles) | Expert testimony on behalf of fee-opposing party |
| *HK v. United Teachers Los Angeles* | Superior Court of the State of California for the County of Los Angeles | Expert testimony on behalf of fee-opposing party |
| *Formosa v. King's Seafood* | AAA Arbitration (Los Angeles) | Expert testimony on behalf of fee-opposing party |
| *In re Cahill* | Texas District Court 451st Judicial District (Kendall County, Texas) | Expert testimony on behalf of fee-opposing party |
| *Lloyds Underwriters v. Zillow* | Superior Court of the State of California for the County of San Francisco | Expert testimony on behalf of fee-seeking party |
| *Scofield v. Superior Court of California for the County of Santa Clara* | Superior Court of the State of California for the County of Santa Clara | Expert testimony on behalf of fee-opposing party |
| *Winter v. El Camino Community College* | State of California Public Employment Relations Board | Expert testimony on behalf of fee-opposing party |
| *Bond v. QVC* | Signature Resolution Arbitration (Los Angeles) | Expert testimony on behalf of fee-seeking party |
| *Elmy v. Related Management* | Superior Court of the State of California for the County of Los Angeles | Expert testimony on behalf of fee-opposing party |

| CASE NAME | COURT/PANEL | NATURE OF TESTIMONY |
|---|---|---|
| *Griffith v. Related Management* | Superior Court of the State of California for the County of Los Angeles | Expert testimony on behalf of fee-opposing party |
| *Mendes v. Stonermor* | JAMS Arbitration (San Francisco) | Expert testimony on behalf of fee-opposing party |
| *Nava v. Related Management* | Superior Court of the State of California for the County of Los Angeles | Expert testimony on behalf of fee-opposing party |
| *Simers v. Los Angeles Times* | Superior Court of the State of California for the County of Los Angeles | Expert testimony on behalf of fee-opposing party |
| *Gardner v Abode Communities* | Superior Court of the State of California for the County of Los Angeles | Expert testimony on behalf of fee-opposing party |
| *Carter v Abode Communities* | Superior Court of the State of California for the County of Los Angeles | Expert testimony on behalf of fee-opposing party |
| *Government Accountability & Oversight v Regents of the University of California* | Superior Court of the State of California for the County of Los Angeles | Expert testimony on behalf of fee-opposing party |
| *Drakeford v. Capital Benefit* | United States District Court for the Northern District of California | Expert testimony on behalf of fee-opposing party |
| *Glaser Weil v. Bulochnikov* | JAMS Arbitration (Los Angeles) | Expert deposition testimony on behalf of fee-opposing party |
| *Sammis v. Bridgestone* | AAA Arbitration (Los Angeles) | Expert testimony on behalf of fee-opposing party |

| CASE NAME | COURT/PANEL | NATURE OF TESTIMONY |
|---|---|---|
| *Cappello & Noel v. Rubin* | JAMS Arbitration (Los Angeles) | Expert deposition testimony on behalf of fee-seeking party |
| *Martin v. Toyota Motor Credit Corp.* | United States District Court for the Central District of California | Expert testimony on behalf of fee-opposing party |
| *Smith v. Abode* | Superior Court of the State of California for the County of Los Angeles | Expert testimony on behalf of fee-opposing party |
| *Reyes v. Dunbar Armored* | Superior Court of the State of California for the County of Los Angeles | Expert testimony on behalf of fee-seeking party |
| *Save Mount Diablo v. City of Pittsburg* | Superior Court of the State of California for the County of Contra Costa | Expert testimony on behalf of fee-opposing party |
| *Doe v. Commission on Professional Competence* | Superior Court of the State of California for the County of Los Angeles | Expert testimony on behalf of fee-opposing party |
| *Woods v. Related Management Company* | Superior Court of the State of California for the County of Los Angeles | Expert testimony on behalf of fee-opposing party |
| *Pappas v. State Coastal Conservatory* | Superior Court of the State of California for the County of Santa Barbara | Expert testimony on behalf of fee-opposing party |
| *Doe v. Torrance Unified School District* | Superior Court of the State of California for the County of Los Angeles | Expert testimony on behalf of fee-opposing party |
| *Miller v. Desert Community College District* | Superior Court of the State of California for the County of Riverside | Expert testimony on behalf of fee-opposing party |

# EXHIBIT C
## (TO EXPERT WITNESS REPORT OF GRANT D. STIEFEL)



*ELM Solutions*

# 2022 Real Rate Report®

The industry's leading analysis of law firm rates, trends, and practices





**Report Editor**

**Jeffrey Solomon**
Senior Director, Product Management Legal
Analytics, Wolters Kluwer ELM Solutions

**Lead Data Analysts**

**Carol Au**
Business Systems Quantitative Analyst
Wolters Kluwer ELM Solutions

**Pankaj Saha**
Data Engineer
Wolters Kluwer ELM Solutions

**ELM Solutions Creative**

**David Andrews**
Senior Graphic Designer
Wolters Kluwer ELM Solutions

**Contributing Analysts and Authors**

**Jason Bender**
Legal Analytics Product Manager
Wolters Kluwer ELM Solutions

**Nathan Cemenska**
Associate Director, Product Management
Wolters Kluwer ELM Solutions

**Haemi Jung**
Strategic Business Intelligence Manager
Wolters Kluwer ELM Solutions

**Margie Sleboda**
Lead Technology Product Manager
Wolters Kluwer ELM Solutions

**Executive Sponsor**

**Barry Ader**
Vice President, Product Management and
Marketing
Wolters Kluwer ELM Solutions

© 2004 – 2022 Wolters Kluwer ELM Solutions. All rights reserved. This material may not be reproduced, displayed, modified, or distributed in any form without the express prior written permission of the copyright holders. To request permission, please contact:

ELM Solutions, a Wolters Kluwer business
115 Glastonbury Boulevard, Suite 102
Glastonbury, CT 06033 United States
ATTN: Marketing
+1-860-549-8795

**LEGAL CAVEAT**

Wolters Kluwer ELM Solutions has worked to ensure the accuracy of the information in this report; however, Wolters Kluwer ELM Solutions cannot guarantee the accuracy of the information or analyses in all cases. Wolters Kluwer ELM Solutions is not engaged in rendering legal, accounting, or other professional services. This report should not be construed as professional advice on any particular set of facts or circumstances. Wolters Kluwer ELM Solutions is not responsible for any claims or losses that may arise from any errors or omissions in this report or from reliance upon any recommendation made in this report.

# Section I: High-Level Data Cuts

## Cities
By Matter Type

**2022 - Real Rates for Associate and Partner**                    **Trend Analysis - Mean**

| City | Matter Type | Role | n | First Quartile | Median | Third Quartile | 2022 | 2021 | 2020 |
|------|-------------|------|---|----------------|--------|----------------|------|------|------|
| **Jackson MS** | Litigation | Associate | 56 | $55 | $225 | $250 | $178 | $203 | $175 |
| | Non-Litigation | Partner | 24 | $315 | $420 | $485 | $418 | $394 | $375 |
| | | Associate | 25 | $55 | $126 | $255 | $155 | $125 | $259 |
| **Kansas City MO** | Litigation | Partner | 74 | $413 | $450 | $556 | $472 | $450 | $450 |
| | | Associate | 50 | $252 | $329 | $385 | $319 | $316 | $305 |
| | Non-Litigation | Partner | 101 | $411 | $487 | $615 | $519 | $487 | $464 |
| | | Associate | 73 | $250 | $320 | $385 | $322 | $312 | $285 |
| **Las Vegas NV** | Non-Litigation | Partner | 20 | $350 | $425 | $525 | $440 | $422 | $432 |
| | | Associate | 11 | $238 | $267 | $368 | $301 | $297 | $282 |
| **Little Rock AR** | Non-Litigation | Partner | 11 | $215 | $215 | $308 | $264 | $256 | $298 |
| **Los Angeles CA** | Litigation | Partner | 322 | $516 | $725 | $1,045 | $799 | $739 | $702 |
| | | Associate | 408 | $400 | $615 | $855 | $642 | $606 | $564 |
| | Non-Litigation | Partner | 521 | $596 | $868 | $1,201 | $903 | $902 | $858 |
| | | Associate | 667 | $441 | $603 | $845 | $653 | $712 | $648 |

# Section I: High-Level Data Cuts

## Cities
By Matter Type

**2022 - Real Rates for Associate and Partner**                    **Trend Analysis - Mean**

| City | Matter Type | Role | n | First Quartile | Median | Third Quartile | 2022 | 2021 | 2020 |
|------|------------|------|---|----------------|--------|----------------|------|------|------|
| **Rochester NY** | Non-Litigation | Partner | 12 | $270 | $360 | $488 | $386 | $341 | $446 |
| | | Associate | 13 | $220 | $310 | $375 | $314 | $278 | $287 |
| **Sacramento CA** | Non-Litigation | Partner | 11 | $381 | $437 | $682 | $534 | $559 | $516 |
| **Salt Lake City UT** | Litigation | Partner | 14 | $246 | $353 | $468 | $363 | $333 | $379 |
| | Non-Litigation | Partner | 42 | $297 | $371 | $447 | $391 | $363 | $353 |
| | | Associate | 22 | $220 | $240 | $270 | $248 | $247 | $228 |
| **San Diego CA** | Litigation | Associate | 23 | $151 | $225 | $300 | $255 | $258 | $264 |
| | Non-Litigation | Partner | 89 | $332 | $540 | $1,066 | $699 | $667 | $649 |
| | | Associate | 71 | $250 | $325 | $424 | $373 | $378 | $351 |
| **San Francisco CA** | Litigation | Partner | 143 | $423 | $675 | $995 | $742 | $711 | $691 |
| | | Associate | 98 | $325 | $430 | $731 | $525 | $517 | $470 |
| | Non-Litigation | Partner | 221 | $475 | $750 | $950 | $758 | $746 | $741 |
| | | Associate | 151 | $338 | $486 | $702 | $545 | $563 | $507 |
| **San Jose CA** | Litigation | Partner | 33 | $654 | $921 | $1,133 | $916 | $907 | $864 |

# Section I: High-Level Data Cuts

## Cities
By Years of Experience

**2022 - Real Rates for Partner**                                                          **Trend Analysis - Mean**

| City | Years of Experience | n | First Quartile | Median | Third Quartile | 2022 | 2021 | 2020 |
|------|--------------------|----|----------------|--------|----------------|------|------|------|
| **Kansas City MO** | Fewer Than 21 Years | 46 | $400 | $450 | $537 | $473 | $411 | $397 |
| | 21 or More Years | 68 | $440 | $553 | $658 | $539 | $497 | $491 |
| **Las Vegas NV** | Fewer Than 21 Years | 12 | $284 | $381 | $495 | $389 | $349 | $343 |
| | 21 or More Years | 13 | $350 | $425 | $515 | $468 | $456 | $472 |
| **Los Angeles CA** | Fewer Than 21 Years | 183 | $533 | $801 | $1,075 | $804 | $797 | $682 |
| | 21 or More Years | 333 | $550 | $765 | $1,133 | $863 | $842 | $808 |
| **Memphis TN** | Fewer Than 21 Years | 14 | $288 | $331 | $380 | $345 | $317 | $328 |
| | 21 or More Years | 15 | $355 | $415 | $425 | $394 | $382 | $375 |
| **Miami FL** | Fewer Than 21 Years | 57 | $370 | $450 | $598 | $490 | $498 | $443 |
| | 21 or More Years | 104 | $388 | $581 | $749 | $584 | $580 | $536 |
| **Milwaukee WI** | 21 or More Years | 16 | $302 | $454 | $613 | $589 | $515 | $530 |
| **Minneapolis MN** | Fewer Than 21 Years | 36 | $470 | $530 | $607 | $532 | $486 | $499 |
| | 21 or More Years | 84 | $507 | $675 | $796 | $656 | $620 | $589 |
| **Nashville TN** | Fewer Than 21 Years | 28 | $375 | $405 | $535 | $449 | $405 | $397 |

# Section I: High-Level Data Cuts

## Cities
By Years of Experience

**2022 - Real Rates for Partner**                                       **Trend Analysis - Mean**

| City | Years of Experience | n | First Quartile | Median | Third Quartile | 2022 | 2021 | 2020 |
|------|--------------------|---|----------------|--------|----------------|------|------|------|
| **Pittsburgh PA** | Fewer Than 21 Years | 41 | $420 | $605 | $754 | $598 | $572 | $490 |
| | 21 or More Years | 76 | $428 | $564 | $756 | $603 | $611 | $565 |
| **Portland ME** | Fewer Than 21 Years | 12 | $308 | $340 | $416 | $347 | $351 | $347 |
| | 21 or More Years | 19 | $218 | $385 | $450 | $358 | $385 | $346 |
| **Portland OR** | Fewer Than 21 Years | 33 | $400 | $465 | $639 | $522 | $471 | $418 |
| | 21 or More Years | 35 | $450 | $502 | $653 | $533 | $516 | $485 |
| **Raleigh NC** | Fewer Than 21 Years | 15 | $281 | $366 | $467 | $393 | $414 | $430 |
| | 21 or More Years | 24 | $275 | $425 | $595 | $454 | $487 | $468 |
| **Richmond VA** | Fewer Than 21 Years | 25 | $585 | $723 | $775 | $682 | $652 | $626 |
| | 21 or More Years | 30 | $425 | $680 | $976 | $713 | $629 | $625 |
| **Salt Lake City UT** | Fewer Than 21 Years | 19 | $293 | $368 | $430 | $364 | $334 | $349 |
| | 21 or More Years | 24 | $314 | $425 | $515 | $424 | $392 | $375 |
| **San Diego CA** | Fewer Than 21 Years | 23 | $380 | $425 | $680 | $563 | $608 | $531 |
| | 21 or More Years | 58 | $447 | $707 | $1,212 | $822 | $739 | $654 |

# Section III: Practice Area Analysis

**Intellectual Property: Patents**
By City

**2022 — Real Rates for Associate and Partner**            **Trend Analysis - Mean**

| City | Role | n | First Quartile | Median | Third Quartile | 2022 | 2021 | 2020 |
|------|------|---|----------------|--------|----------------|------|------|------|
| **Atlanta GA** | Partner | 15 | $621 | $692 | $782 | $699 | $618 | $587 |
|  | Associate | 16 | $451 | $502 | $608 | $520 | $494 | $457 |
| **Austin TX** | Partner | 21 | $535 | $743 | $858 | $680 | $660 | $598 |
|  | Associate | 24 | $401 | $569 | $683 | $530 | $506 | $516 |
| **Boston MA** | Partner | 31 | $550 | $693 | $836 | $675 | $682 | $654 |
|  | Associate | 14 | $351 | $483 | $747 | $527 | $480 | $487 |
| **Chicago IL** | Partner | 30 | $447 | $573 | $849 | $693 | $629 | $644 |
|  | Associate | 22 | $395 | $495 | $595 | $504 | $499 | $474 |
| **Cleveland OH** | Associate | 22 | $150 | $200 | $211 | $239 | $240 | $264 |
| **Dallas TX** | Partner | 11 | $728 | $924 | $995 | $886 | $748 | $685 |
|  | Associate | 13 | $608 | $690 | $758 | $667 | $568 | $574 |
| **Houston TX** | Partner | 23 | $325 | $492 | $876 | $632 | $564 | $566 |
|  | Associate | 45 | $200 | $245 | $335 | $297 | $257 | $237 |
| **Los Angeles CA** | Partner | 28 | $708 | $950 | $1,100 | $943 | $873 | $852 |
|  | Associate | 83 | $575 | $765 | $890 | $736 | $698 | $660 |

# EXHIBIT D
# (TO EXPERT WITNESS REPORT OF GRANT D. STIEFEL)

# ARBITRATION ADVISORY

## 2016-02

## ANALYSIS OF POTENTIAL BILL PADDING AND OTHER BILLING ISSUES

### Replaces and Supersedes Arbitration Advisory 2003-01

### March 25, 2016

Points of view or opinions expressed in this document are those of the Committee on Mandatory Fee Arbitration.  They have not been adopted or endorsed by the State Bar's Board of Trustees and do not constitute the official position or policy of the State Bar of California.

## QUESTION PRESENTED

When a lawyer's fee bill overstates the amount of time spent for work performed, it is called "bill padding."  If a client alleges that a lawyer's bills are not accurate or truthful, how can an arbitrator assess the evidence, including the fee bills, for possible bill padding?  This advisory explores the question of how an arbitrator may assess the evidence to identify bill padding.[1]

## INTRODUCTION

Most hourly fee bills are a collection of time entries itemizing work performed in the privacy of a lawyer's office.  Therefore, it is difficult to verify the accuracy of the time entries. Accordingly, arbitrators should do at least four things:

A.  Evaluate the process by which the fee bill was prepared and the specificity of the time entries;
B.  Evaluate the staffing used on the matter;
C.  Evaluate the work performed against the time billed, and
D.  Look for certain patterns in the descriptions of the work performed, including the time entries.

## DISCUSSION

---

[1] Rules and observations about determining reasonable attorney's fees in general are addressed in other Arbitration Advisories.  This advisory focuses on a subset of that topic: when too much time is alleged to have been recorded for the individual units of work performed.  In the event that an arbitrator encounters bill padding, he/she may refer to our other arbitration advisories for assistance in determining an appropriate charge under the circumstances.

**A.     Evaluate the process by which the fee bill was prepared and the specificity of the
time entries**

In order to understand the likely areas to look for bill padding, it is useful to consider the
historical background of professional fees charged by a lawyer [*See* American Bar Association
Commission on Billable Hours Report (August, 2002), referred to hereinafter as "ABA Report"
(See http://www.abanet.org)]. Prior to the 1960s, the majority of lawyers billed clients in flat
sums or fixed amounts - often at the conclusion of the matter. This required some estimating and
discretion on the part of the lawyer.  A lawyer's fee bill often read something like this:

"Fee for services rendered, $ 750.00."

Clients sometimes paid their bills six months or a year after receipt of the fee bill, which
reflected services performed long before the fee bill was even sent.

In Gisbrecht v. Barnhart, 535 U.S. 789 (2002), the Supreme Court wrote:

". . . .  An American Bar Association (ABA) report, published in 1958,
observed that attorneys' earnings had failed to keep pace with the rate of inflation;
the report urged attorneys to record the hours spent on each case in order to
ensure that fees ultimately charged afforded reasonable compensation for
counsels' efforts. (*citation omitted).*

Hourly records initially provided only an internal accounting check.  See
Honest Hour 19. The fees actually charged might be determined under any
number of methods: the annual retainer, the fee-for-service method, the "eyeball"
method under which the attorney estimated an annual fee for regular clients, or
the contingent-fee method, recognized by this Court in Stanton v. Embrey, 93 U.
S. 548, 556 (1877), and formally approved by the ABA in 1908.  See Honest
Hour [W. Ross, The Honest Hour: The Ethics of Time-Based Billing by Attorneys
(1996),13-19]. As it became standard accounting practice to record hours spent on
a client's matter, attorneys increasingly realized that billing by hours devoted to a
case was administratively convenient; moreover, as an objective measure of a
lawyer's labor, hourly billing was readily impartable to the client.  Id., at 18. By
the early 1970's, the practice of hourly billing had become widespread. *See id*., at
19, 21."

**1.     Evaluate the process by which the fee bill was prepared**

In the now-standard chronological fee bill used by lawyers, almost all time is (or should
be) itemized by day and by timekeeper.  If a lawyer or other timekeeper does several things in
one day on a particular matter then he or she must decide how to best describe this work and how
much time to record for that work.  An arbitrator's review of fee bills should include an
assessment of the method and timing used to prepare the bills in order to form an understanding
regarding the accuracy of the data shown by the fee bills.

Some lawyers still use word processing programs to generate fee bills.  Others use specialized billing software programs.  Many billing software programs in use today have a timer feature that allows the user to input "start" and "stop" commands for one or more matters.  The billing software program then automatically calculates the elapsed time for each task in the same manner as a stopwatch.  If the evidence at the arbitration reveals that lawyers properly utilized the timer feature that is a factor tending toward accuracy.

While it is almost universally acknowledged that contemporaneous records are the best practice, many times the press of business is such that a day or two (or more) passes without the lawyer recording his/her time.  Sometimes a month may pass without any entries.  In rare cases, a year or more may pass before a lawyer goes through his/her case file and attempts to re-create what transpired in the case since its inception. It is generally at the point when a fee bill needs to be generated that the lawyer is faced with the need to reconstruct what happened a day or two or a month ago (or a year ago) with great precision.  If the lawyer is able to prepare the fee bills using information from notes he/she made contemporaneous with the tasks actually performed, that is a factor tending towards accuracy.  But if the reconstruction is done by the lawyer going through his or her file and then ascribing a time entry to each e-mail, letter, document and calendar entry in the file, then it is much less likely that the time entries are truly accurate. While the corresponding fee bills may appear to be very precise, with exact times noted for each specific and itemized activity, the appearance of accuracy may be deceptive and the time recorded should be assessed by the arbitrator.  Under such circumstances, it may be appropriate to put the burden of providing evidence/facts to support the accuracy of the time entries onto the lawyer.

The arbitrator should also examine who recorded the entries and created the fee bills. The original time entries are generally recorded by the lawyer or other person who performed the task.  However, in some firms, a support person, such as a secretary, paralegal, or billing clerk, records the time entries ultimately charged to the client.  Variations for this practice abound.  In some firms, lawyers hand-write their entries on paper and some other person inputs them in the billing software.  In other firms, a billing clerk may go through the case file on a periodic basis and record a time entry for every scrap of paper in that file.  For instance, if the file contains a letter from opposing counsel, the billing clerk may charge the client an agreed-upon minimum charge irrespective of whether the lawyer actually reviewed that letter and how long it took. Suffice it to say, the arbitrator may consider evidence of who actually recorded the time entries [and when they were recorded] to assess the accuracy of the corresponding fee bills.

It is customary for larger law firms to have a draft of the fee bill, commonly referred to as a "pre-bill," reviewed by the partner or lawyer in charge of billing on the matter.  The billing partner may not have actually worked on the file, but is otherwise in control of the relationship with the client.  If pre-bills are utilized, the billing partner should scrutinize and edit the time entries in the "pre-bills" to ensure that they are accurate.  The recorded time entries may be increased or decreased in an exercise called "billing judgment" by the billing partner. However, any evidence that the pre-bills were adjusted upwards should be examined carefully, as it may indicate that the client is being charged more time than actually expended by his/her lawyer.  Absent clearly defined and explained terms in the written fee agreement allowing such upward adjustments, the increased time may be evidence of bill padding.  For example,

3

increasing a time entry to a contractually agreed-upon minimum charge may be appropriate, as would an increase to reflect time inadvertently omitted by the lawyer.  On the other hand, increasing a time charge for the sake of inflating the fee bill is not.  If an arbitrator encounters such circumstances, the lawyer should bear the burden to clarify and substantiate such increased time entries.

The pre-bills may not be carefully reviewed by the billing partner for a number of reasons, including the fact that most billing partners are very busy and do not have or want to allocate the time to check each pre-bill carefully, the entries may be for a lawyer who is not readily available, or the billing partner may have a huge stack of pre-bills to go through and only a short time to do so since the firm wants to "get the bills out".  Consequently, arbitrators should consider facts and evidence concerning the pre-bill process, including whether the lawyer(s) that actually worked on the matter also verified the accuracy of the fee bills, and whether the pre-bill process increased or decreased the accuracy and transparency of the fee bills ultimately delivered to the client for payment.

## 2.    Evaluate the specificity of the time entries

Many lawyers no longer physically handwrite what they do on paper time-sheets but contemporaneously input a description of their tasks directly into their computers.  These types of entries can usually be identified because they are often longer and more detailed.  For example, if a fee bill reads: "meeting with client to discuss the elements of the separate statement of facts and the source of evidence for each element (1.8); research new opinion on the presumptions and burden of proof under Festo and progeny (2.5)" [Example 1], this is likely (but not necessarily) something directly inputted into the billing software program by the lawyer.  On the other hand, the briefer description for the same work of: "meeting with client re MSJ and research burden of proof (4.3)" [Example 2] is probably something initially written in longhand and then later inputted into the billing software program.

Arbitrators should be aware that regardless of the method of time keeping or billing used, it is not the format of the fee bill but the information provided which is important.  Accordingly, the arbitrator's primary focus should be on analyzing those facts that tend to demonstrate the accuracy, or inaccuracy, of the information contained in the fee bills.  When examining the fee bills it is very important to remember that in the vast majority of cases each time entry in a fee bill is merely an estimate of how much time was required for the task performed that is being described in a summary fashion.  Therefore, the longer the time period between when the task was performed and the corresponding time entry is recorded, the greater the probability that the time entry may lack accuracy.

If, in Example 1 above, the client is certain that the meeting required only 30 minutes (with no travel time), then perhaps one could question the entry of 1.8 hours.  But how can one prove that the time for, say, a specific letter was really 12 minutes rather than 30?[2]  If the time is

---

[2] It is just about impossible to be certain that any one single time entry is wrong or faked or padded.  "The 'perfect crime' [is the] padding of bills…" [William G. Ross, The Honest Hour: The Ethics of Time Based Billing by Attorneys (1996)].

block-billed and one does not even know how much time is being claimed for the letter, then what?   In such cases, look at the totality of the evidence.

**B.    Evaluate the staffing used on the matter**

The staffing of a legal matter by a lawyer presents the potential for bill padding that an arbitrator may consider.  The main staffing issues that should be assessed include:
(1) Did multiple lawyers work on the same task simultaneously? and (2) Was the task performed by the proper lawyer?

### 1.    Did multiple lawyers work on the same task simultaneously?

A recurring complaint by clients concerns charges for tasks involving more than one lawyer, paralegal, or support staff from the same firm at the same time.  This typically occurs when a client is charged for multiple lawyers attending a court hearing or deposition, or where two or more lawyers participate in a meeting or telephone call.  Generally, the determination of whether the matter was overstaffed is a question of fact the arbitrator must resolve.  In a mandatory fee arbitration it is appropriate to place the burden of proof on the lawyer to demonstrate that the disputed matters/tasks were properly staffed and not attempts to inflate time charged to a client.

Issues that may affect this factual determination may include the complexity or significance of the case, the litigious nature of the parties, the amount in controversy, client consultation in advance, the client's awareness and lack of objection, or any other fact tending to demonstrate whether it was appropriate for more than one lawyer or support staff to participate in a disputed task.

In some firms, newly admitted lawyers sometimes accompany their supervising lawyer to depositions or court hearings for training purposes.  In most instances, the client should not be charged solely for training time.

It is also generally accepted that the more timekeepers on a case, the higher the bill will be.  Pay particular attention to time recorded by newer associates who record time on the matter only briefly, such as one or two months, particularly if accompanied by entries reflecting the associate recorded "get up to speed" activities, such as "review file."  Such entries by a transient biller may not be an appropriate charge/expense to impose on a client.

### 2.    Was the task performed by the proper lawyer/person?

In some cases, a client may complain that some necessary task was performed by a senior lawyer charging a much higher hourly rate, when it could have been completed by a cheaper associate or support staff.  For instance, in a commercial real estate lease dispute, the firm's main real estate partner, charging $700.00-plus per hour, personally drives to the commercial site to deliver the keys to the complaining landlord.  Even assuming that it was necessary for a licensed lawyer to deliver the keys, the issue becomes why it was done by the most expensive lawyer in the firm.  Was it because some circumstance actually required that specific high-priced lawyer to undertake that task, or was it an inadvertent or intentional attempt to pad the client's bill.  The

client may also challenge delegation of tasks to inexperienced lawyers/staff with resulting inefficiencies. In examining such complaints, arbitrators should consider all of the circumstances relevant to the issue, as well as the custom in the community and the terms of the written fee agreement.

## C.    Evaluate some or all of the work produced against the hours claimed

Arbitrators may consider evidence and facts concerning the actual tasks/work performed by the lawyer, including an analysis of the major items of work performed. How many hours were recorded for this work? How many timekeepers were involved? What did they do? Did they duplicate each other's work? Was some of this "training" time for new lawyers? [3]

Major tasks. It may be appropriate for an arbitrator to review and assess the fee bills to determine how much cumulative time was recorded by the lawyer [or lawyers] to complete a major task. Major tasks may include specific motions, appellate briefs, and transactional documents. An arbitrator may need to quantify the cumulative time first. This task will require the arbitrator to go through the fee bills and essentially group separate billing entries. For example, an arbitrator may have to group all of the entries that refer to the preparation of a specific document, like a demurrer. The arbitrator would then cumulate all of the billing entries referring to or concerning the demurrer, including the review of the complaint and file, conducting legal research, telephone conferences and other communications regarding the demurrer or the sufficiency of the complaint,  and then the time entries for the drafting, revising and finalizing and filing the demurrer.

Once the cumulative time to complete a major task is obtained, then the arbitrator may look at the actual work product [or demurrer in foregoing example] to see if the time falls into a range that appears reasonable. This can be hard to do without some experience in the particular legal area involved.  But, in the above example, if the fee bills reveal that a lawyer recorded 25-plus hours to research, draft, and file the demurrer, the arbitrator should review the actual demurrer to determine if the time recorded is reasonable. If the evidence reveals that the demurrer is a four page boilerplate document attacking the sufficiency of a fraud claim lacking specificity, then the arbitrator may put the burden on the lawyer to explain why it took so long to prepare such a simple document.  On the other hand, if the evidence reveals a 20-page masterpiece artfully advocating novel concepts of law, then that may be evidence tending towards accuracy and reasonableness.

While a times-by-task assessment can be hard to assemble, sometimes the fee bills themselves will have guides to that information within them if the lawyer or law firm utilizes

---

[3] Arbitrators may also consider whether the client was given an estimate or a budget. An "estimate" is not binding. On the other hand, a budget typically involves a more detailed forecast and is supposed to be reasonably accurate (subject to disclosed caveats and assumptions).  Moreover, a budget should be revised if circumstances change and the client should be promptly notified of the revision(s).  Accordingly, if an estimate or budget was given, it may be reviewed to determine whether the disputed tasks were contemplated and explained to the client.

task-based billing codes like the "Uniform Task-Based Management System" published by the American Bar Association (ABA Task Codes).[4]   Task-based billing codes are in fairly wide use but are not standard and there is some debate over their usefulness.  For example, one may know that certain hours were recorded for "L240 - Motions For Judgment" but not how many hours were shown for a specific Motion for Summary Adjudication.  Where such codes are not used, the arbitrator may wish to ask the lawyer to provide evidence of the cumulative time expended on major tasks.  For instance, in Example 1 on page 4, Section A(2) *supra*, assuming that the lawyer utilized the ABA Task Codes, the time billed for meeting with the client to prepare the statement of facts would show the codes "L240" / "A106" in or right after the descriptions of the activities and the totals for these things would (or could) appear on the bill. Once the ABA Task Codes key is in hand, this will help to break down the time and fees into broad tasks, which may be useful information.  Once it is known that a motion for summary judgment required many hours of several timekeepers' time, an arbitrator can then come to a conclusion or ask for an explanation of whether or not the time spent on this particular task is reasonable.

Documents.  There often is a good deal of time shown for "reviewing documents" ("L320 - Document Production") in many litigation matters.  First, ascertain how many document pages were produced or reviewed.  This is sometimes stated in terms of "boxes" which is a standard file storage box normally holding anywhere from 2,000 to 3,500 pages of documents, depending on how tightly the documents are packed.  Some courts and commentators mention 2,500 as the average number of pages per box.  Assess how many timekeepers reviewed the documents and how long it took.  Were summaries of the document reviews created?  Were relevant documents culled?  Were relevant documents scanned and tagged?  If the foregoing tasks were not done, did it then result in multiple lawyers having to review the same documents?   Arbitrators must assess all evidence and facts regarding whether the lawyer's document review was efficient and judicious rather than inadvertent or intentional bill padding.

Also, the propriety of tasks must be considered within the context performed.  For instance, it may be entirely reasonable for a lawyer to charge a client eight-plus hours to carefully review a 100-page prospectus in a federal securities case involving claims of securities fraud and misrepresentation.  On the other hand, it may not be appropriate for a lawyer to charge a client eight-plus hours to review the same 100-page prospectus if the claims in the subject lawsuit are unrelated to the contents of the prospectus [like the wrongful termination of a broker or analyst involved in the securities offering].

Lastly, the arbitrator may consider evidence or facts concerning the timeliness of the client's objection or complaint concerning any fee bill, including when and if the client objected or made inquiries upon receiving the now contested fee bill, and whether the fee agreement

---

[4] The ABA Task Codes assign litigation time within five groups: case assessment, pre-trial, discovery, trial and appeal.  There are also 11 optional Activities Codes (such as "A106 - Communication (with client)" which may be used within each of the five groups in the Litigation Code Set.  The various ABA Task Codes may be accessed at www.americanbar.org/groups/litigation/resources/uniform_task_based_management_system.html

contained an agreement that the client would reasonably or promptly notify the lawyer if there were questions or objections to the fee bills or time entries.

## D.     Consider the format and content of the fee bills

### 1.     High minimum increments

Many fee agreements state that the lawyer shall bill in minimum increments of .10 hour [or six minutes].  When properly disclosed to a client, such a term may provide support or justify charging that client at least .10 hour for any single task irrespective of how long the task took.  Consequently, if the lawyer participates in a phone call regarding the case with opposing counsel that lasts less than two or three minutes, pursuant to the terms of the written fee agreement, the lawyer may be justified in billing .10 hour.

On the other hand, some lawyers still bill in minimum increments of .25 hours or greater.  Consequently, they may charge .25 hours for any compensable task, irrespective of how long the task actually takes.  Assume that such a lawyer charges $300/hour. Assume further that on any given day, that lawyer completes at least four separate compensable tasks, each task taking less than 3 minutes each to complete.  Billing in increments of .25 hours means that the client would be billed $300 for the four tasks [4 x .25 hours x $300/hour = $300]. However, in this example, the client is being charged $300 for less than 12 minutes of actual work, essentially requiring the client to pay an effective hourly rate greater than $1,500.

Courts and fee arbitrators view high incremental charges with suspicion as they may constitute an unreasonable or unconscionable fee, particularly where application of high incremental charges results in overstating the fees owed by a client.  *Your Bill: A Behind the Scene look at a Legal Audit*, Mekler Bulger Tilson Marick & Pearson Legal Audit Group, 1, 2 (March 2007) (high incremental charges artificially inflate fees).  Relevant factors an arbitrator may consider in this regard include the terms of the written fee agreement, the frequency with which apparent minimum billing entries appeared on the bills, and whether there is evidence that the lawyer was judicious in not employing the high minimum billing entries for brief activities either by (1) not recording such activities, (2) aggregating them with other related activities, or (3) "no charged" the entry.

### 2.     Billing all tasks separately

Like high minimum increments, billing every task separately may artificially inflate time entries.  For example, it does not take more than a few seconds to read most routine documents or correspondence.  If a lawyer reads a group of documents or correspondence in a minute or two and then records a minimum time entry for each such document/correspondence, this may artificially increase the time billed to the client.

### 3.     Large whole number time entries

If the bills show time entries in whole numbers, especially large time entries such as 8.0, 9.0, or 10.0, these are probably estimates rather than actual time spent and should be scrutinized,

[except where the event involved trial, mediation, day-long deposition, or other inherently extended activity].

### 4.     Block billing

Block billing is the practice of assigning one time charge to multiple separate tasks.  An extreme example would be a fee bill mailed to a client at the end of the case with a single entry for 200 hours for "work on case" without identifying, among other things, the various individual tasks performed, who performed them, and when.  A more subtle example would be a 3.6 hour charge for "review client's e-mail, retrieve file, call with DR re same, and prepare/send reply."  In the foregoing example, a client would be unable to determine how much time any one of the listed tasks actually took.  More importantly, this type of block billing is prone to hide accountability and prevents a client from discerning which of the listed tasks are compensable and which are not.  For instance, in the foregoing example, what if the lawyer [charging $300/hour] decided to personally make a 3-hour drive to and from an off-site storage facility to retrieve the file rather than sending his secretary [whom he pays $15/hour]?   In such an instance, the itemized tasks actually took the lawyer 3.6 hours to complete, but in most instances, the 3 hours the lawyer spent retrieving the file may not be compensable.  By utilizing block-billing, the client's [and arbitrator's] ability to assess the accuracy [and propriety] of the 3.6 hour charge is impeded.

Block billing may also inadvertently or intentionally inflate the actual time a lawyer takes to complete the listed tasks.  For example, if a lawyer bills a client 8.0 hours on a given day to "prepare for trial," that block of time would most likely include, among other things, time for coffee and restroom breaks, personal calls and non-compensable administrative/managerial tasks.  Since block billing has the potential of, among other things, camouflaging non-compensable tasks, many judges, fee arbitrators, and commentators regard its persistent and egregious use with suspicion, and some consider the practice a violation of Business and Profession Code §6148(b).

The basic rule is that courts [and arbitrators] have wide discretion to require additional evidence to support the accuracy of block-billed entries.  In a mandatory fee arbitration, it is the lawyer's burden to provide such additional support, which may include testimony and documentary evidence.   After consideration of such additional support, or lack thereof, arbitrators may assign a reasonable percentage to the block billed entries, disregard them altogether, or determine that other evidence is sufficient to substantiate the hours aside from the block billed entries.  The court in *Heritage Pacific Financial v. Monroy*, (2013) 215 Cal.App.4th 972, 1010 held "trial courts retain discretion to penalize block billing when the practice prevents them from discerning which tasks are compensable and which are not." Previously, the court in *Bell v. Vista Unified School Dist*., (2001) 82 Cal.App.4th 672, 689, held that "the trial court should exercise its discretion in assigning a reasonable percentage to the entries, or simply cast them aside" if counsel "cannot further define his billing entries …."  In a much harsher tone, the court in *Christian Research Institute v. Alnor*, (2008) 165 Cal.App.4th 1315, 1329 held:

> Similarly, counsel may not submit a plethora of noncompensable, vague, block-billed attorney time entries and expect particularized, individual deletions as the

only consequence. The trial court could reasonably conclude counsel made no effort to prune the fee request to comply with the law. Counsel erred grievously by attempting to transfer that responsibility onto the trial court. The trial court could reasonably conclude counsel's disregard for the law undercut the credibility of their fee request and, as officers of the court, warranted a severe reaction.

If a lawyer uses block-billing, it may be appropriate for the arbitrator to place on the lawyer the burden of proving that all of the time entries that were block billed are actually compensable and appropriate.

In our prior version of this arbitration advisory titled "Detecting Attorney Bill Padding" (Arbitration Advisory 2003-01)(January 29, 2003), at section C 4 on page 7, the State Bar's Committee on Mandatory Fee Arbitration ["Committee"] opined that block billing "hides accountability and may increase time by 10% to 30%." However, the arbitrator's discretion is not limited to the 10% to 30% range. Rather, as noted above, an arbitrator may consider all evidence to determine the propriety of any block billed entry and may conclude, upon due consideration of all such evidence, that the entire time billed is appropriate or some portion is not.

### 5.  Standardized work descriptions and lack of detail

If an arbitrator encounters the exact same phrases used again and again in the fee bills, it is likely that some routine has set in. This may allow some "down time" to find its way into the fee bills. An entry such as "review documents produced by opposition, 7.5 hours" is typical.

Furthermore, generalized time entries such as "research issues", "review file", "attention to file", "discovery", "prepare for trial", "trial prep", and other similar general statements are not specific enough to let the client know what was done. If a lawyer uses such non-specific task descriptions, it may be appropriate for the arbitrator to place on the lawyer the burden of clarifying what was actually done to assess whether the generalized time entries are actually compensable and appropriate.

### 6.  Wrong times

Sometimes a client knows that a specific task took less time than was billed. For example, a lawyer charges four hours to attend a deposition in his office, but the corresponding deposition transcript confirms that the deposition started at 10 am and finished at 11 am. A fee bill may charge a client for the lawyer attending an in-person meeting with the client in his Los Angeles office, but the client was out of the country on that day. The lawyer may charge an hour to prepare a letter to the client, but cannot produce the letter at the arbitration. In each instance, the arbitrator should examine all of the evidence presented by the parties to determine whether the disputed task was actually performed and if so, that it took the time recorded in the fee bills. Demonstrably false or inaccurate entries, unless explained, may justify the arbitrator viewing with distrust other disputed billings or time entries.

### 7.   Timeliness of invoices

As noted above, if too much time has elapsed between the disputed task and generating the fee bill, the times shown might be estimates or best guesses of the time involved.  On the other hand, it is possible that the timekeeper recorded his or her time contemporaneously but did not generate the fee bill for some reason.  The lawyer should clarify why the fee bills were not timely delivered.  The arbitrator may also examine the fee agreement to determine if the lawyer committed to delivering periodic billing, and other factors such as (1) whether delayed billing came during a period of substantial activity, (2) whether the fee bill was a surprise to the client, (3) whether the claimed fee exceeds estimates or budgets, and (4) whether there were legitimate reasons that prevented the lawyer from timely delivering a fee bill to the client.

### 8.   Experts and outside investigators

Lawyers sometimes retain expert witnesses, consultants, investigators and other third-party professionals to assist a client.  These third-party professionals typically forward their bills to the lawyer for payment.  Sometimes the lawyer pays such third party bills directly and then subsequently sends the client an invoice for the advanced costs.  Other times, the lawyer forwards the third party bill directly to the client for payment.  Whatever the process used, it is imperative that such third party bills state what was done with adequate detail to allow a client to decipher what was done and how much is being charged.  If the lawyer advanced payment for such third party bills, representations and proof that these charges were actually paid should also be produced.

### 9.   Overhead items

A lawyer's hourly fee should include consideration for overhead items like rent, support staff wages, telephone service, internet fees, office supplies, library charges, seminars, continuing legal education charges, malpractice insurance and a whole host of expenses a lawyer will incur every day to keep his/her practice operating.  Consideration for such expenses explains why lawyers in located in urban cities, like downtown Los Angeles and San Francisco, may generally charge higher hourly rates than their colleagues who rent much less expensive office space in the suburbs and outlying farming communities.  Since overhead expenses are a cost of doing business, and should be reflected in the professionals' hourly rates, they should not be passed on to the client unless the client has clearly agreed otherwise in the fee agreement.  (*See* American Bar Association Standing Committee on Ethics and Professional Responsibility, Formal Opinion 93-379, *Billing for Professional Fees, Disbursements, and Other Expenses*, (December 6, 1993).

### 10.   Ministerial, administrative and secretarial tasks

As noted above, a lawyer's hourly fee should include consideration for support staff wages.  Accordingly, it may be inappropriate to allow a lawyer to also charge a client his/her hourly rate for doing secretarial work.  For instance, the vast majority of lawyers are able to prepare judicial form interrogatories in less than 5-10 minutes.  Their assistants or secretaries then prepare the actual hard document, prepare and attach the proof of service, generate the

stamped envelope and then serves it on the opposing party. Typically, the only service the client should be charged for is the lawyer's 5-10 minutes to determine what boxes to check off on the form interrogatories. But arbitrators will inevitably encounter situations where the lawyer also charges the client the time spent preparing the proof of service and mailing. It is not uncommon to encounter fee bills that charge clients up to an hour for a simple task like preparing and serving form interrogatories. Arbitrators will also encounter situations where lawyers personally type their own correspondence, motions and other documents. This is typically not a problem, unless of course, the lawyer can only type 10-20 word a minute. In such circumstances, the arbitrator should consider the lawyer's typing proficiency, whether support staff is available for such tasks, and whether the hourly fee agreed-upon by the client includes consideration of support staff wages.

Also, operating a law practice requires substantial efforts on the part of the lawyers wholly unrelated to representing clients. This includes dozens of administrative, managerial, and ministerial tasks lawyers must perform every day. In the vast majority of cases, it is inappropriate to seek to charge a client for such non-legal tasks.

### 11.   Paralegals

The use of paralegals and unlicensed legal assistants is wide-spread and completely appropriate if disclosed to the client. Guideline 8 of the 2004 update of the ABA Model Guidelines for the Utilization of Paralegal Services states that: "A lawyer may include a charge for the work performed by a paralegal in setting a charge and/or billing for legal services." Courts have addressed and accepted the theory that paralegal fees are appropriately billed and recovered by lawyers under various prevailing party attorney fee recovery statutes. *Missouri v. Jenkins* (1989) 491 U.S. 274; *Richlin Security Service Co. v. Chertoff* (2008) 553 U.S. 571; and *Guinn v. Dotson* (1994) 23 Cal. App. 4th 262. In California, paralegal fees are only compensable if in total compliance with Business and Profession Code §6450. This requires that the paralegal actually qualifies as a paralegal and the type of work/tasks he/she purports to perform is compensable.

Surprisingly, many lawyers do not realize that some tasks performed by a paralegal are not compensable. The test to determine whether a task performed by a paralegal is compensable is not predicated on the person that performs it, but rather on the nature of the task itself. Business and Profession Code §6450 (a) states:

(a) "Paralegal" means a person who holds himself or herself out to be a paralegal, who is qualified by education, training, or work experience, who either contracts with or is employed by an attorney, law firm, corporation, governmental agency, or other entity, and **who performs substantial legal work under the direction and supervision of an active member of the State Bar of California**, as defined in Section 6060, or an attorney practicing law in the federal courts of this state, that has been specifically delegated by the attorney to him or her. **Tasks performed by a paralegal include, but are not limited to, case planning, development, and management; legal research; interviewing clients; fact gathering and retrieving information; drafting and analyzing legal**

12

> **documents; collecting, compiling, and utilizing technical information to make an independent decision and recommendation to the supervising attorney; and representing clients before a state or federal administrative agency if that representation is permitted by statute, court rule, or administrative rule or regulation**.

(Emphasis added).

Furthermore, Business and Profession Code §6454 states that the "terms "paralegal," "legal assistant," "attorney assistant," "freelance paralegal," "independent paralegal," and "contract paralegal" are synonymous for purposes of this chapter. Consequently, billing a client for a paralegal or legal assistant's ministerial, administrative, or secretarial duties may be improper, particularly if not disclosed in the fee agreement and explained to the client. However, even if the lawyer disclosed the use of a paralegal or unlicensed legal assistant for ministerial, administrative or secretarial tasks in the fee agreement, the arbitrator may assess whether the consequent fees agreed upon were unconscionable at the time the fee agreement was entered into pursuant to Rule 4-200 of the Rules of Professional Conduct.

Lastly, it is imperative to remember that it is improper for a paralegal to establish the fees charged to the client for the paralegal's services. Business and Professions Code §6450 (b)(8). This prohibition may prove to be a minefield for lawyers utilizing their paralegals to act as calendar clerks, office managers, supervisors or administrators who control and prepare the lawyer's/firm's fee bills.

## 12.    Canned Briefs-Recycled Work

Even newly admitted lawyers have access to a library or cache of canned briefs and template documents they may utilize in their practice. These include, but are not limited to, canned or standardized pleadings, motions, discovery requests, and transactional documents like trusts and leases. These canned or standardized documents may have been created by the lawyer or some third source. The issue becomes whether it is appropriate for the lawyer to bill a client any premium for the creation of the original document, or may the lawyer only bill for the revisions made to the canned or standardized document.

As a threshold matter, the ABA long ago opined that:

In addressing the hypothetical regarding...recycled work product, it is helpful to consider these questions, not from the perspective of what a client could be forced to pay, but rather from the perspective of what the lawyer actually earned.... A lawyer who is able to reuse old work product has not re-earned the hours previously billed and compensated when the work product was first generated. Rather than looking to profit from ... the luck of being asked the identical question twice, the lawyer who has agreed to bill solely on the basis of time spent is obliged to pass the benefits of these economies on to the client. The practice of billing several clients for the same time or work product, since it results in the

earning of an unreasonable fee, therefore is contrary to the mandate of the Model
Rules. Model Rule 1.5.

(American Bar Association Standing Committee on Ethics and Professional Responsibility,
Formal Opinion 93-379, *Billing for Professional Fees, Disbursements, and Other Expenses*,
(December 6, 1993); *See also Ethics and Time-Based Billing*, Michael Downey, Law Practice
Today, ABA Law Practice Management Section, (January 2006) (Over-billing occurs when
"billing the client who received the recycled work product time already billed to another client
when that work product was originally created."); *See also, The Moral Compass of the American
Lawyer*, Richard Zitrin and Carol Langford, (1999 Ballantine Books)(examples of cases in which
lawyers were prosecuted and convicted of bill padding practices including billing multiple clients
simultaneously and for recycled work product).

> Similarly, the authors of the well-regarded Rutter Guide, caution:

> Attorneys who prepare standardized documents for clients (e.g., wills, partnership
> agreements) often keep forms of those documents on their computers to use as
> "templates" that can be revised and customized to suit each client. Absent clear
> disclosure to the client, attorneys billing on an hourly basis cannot properly add
> additional hours to a client's bill when revising such an "in-house" form to reflect
> the time spent preparing the original (template) form. [Orange County Bar Ass'n
> Form.Opn. 99–001]

*California Practice Guide: Professional Responsibility*, Paul W. Vapnek, Mark L. Tuft, Ellen R.
Peck and Justice Howard B. Wiener (Ret.), Chapter 5. Attorney Fees And Fee Agreements,
Paragraph 5-945 (2012).

Given the foregoing, in the event a lawyer seeks to charge a client a "premium" for the
use of recycled work, the arbitrator should determine if that "premium" was properly stated and
disclosed in the written fee agreement.  (State Bar of California Committee on Mandatory Fee
Arbitration, Arbitration Advisory 1998-03, *Determination of a "Reasonable" Fee*, pages 15-
16  (Updated March 20, 2015).  If it is not, it may be evidence of bill padding.

### 13.    Billing multiple clients for the same time

 An arbitrator may encounter situations where the lawyer simultaneously worked on
matters of several clients.  For example, a lawyer charges two clients the full five hours it took
him to attend two court hearings for the two separate clients on the same morning in the same
court.  The issue is whether each client can be properly billed for the full five hours.  Generally,
billing multiple clients for the same time raises questions of potential impropriety.  The answer
typically depends on whether the terms of the fee agreements actually disclosed and explained
the manner of billing to the all of the affected clients and the fee agreements of every affected
client is fair and reasonable.  (*See* American Bar Association Standing Committee on Ethics and
Professional Responsibility, Formal Opinion 93-379, *Billing for Professional Fees,
Disbursements, and Other Expenses*, (December 6, 1993);  State Bar of California Standing
Committee on Professional Responsibility and Conduct, Formal Opinion No. 1996-147).

Therefore, if a lawyer seeks to bill the same time to more than one client simultaneously, that arrangement must be fair, reasonable, fully disclosed in the written fee agreements of all affected clients, and fully explained to each client. If it is not, then it may be evidence of bill padding. Additionally, the arbitrator must ensure that, irrespective of how much time the lawyer ultimately bills to any one client for such a collective task, the resulting fees are not unconscionable pursuant to Rule 4-200 of the Rules of Professional Conduct.

### 14.   Ghost Billing

"Ghost billing" occurs when a lawyer bills for work or task(s) performed by another person. Variations abound. For example, a paralegal or associate prepares a motion, but the partner in charge bills the time as his/her own. Or a non-employee contract attorney attends a status conference, but the lawyer of record bills the time as his/her own. Ghost billing should be scrutinized as it may constitute (1) a deceptive practice, (2) a violation of Business and Professions Code Section 6148(b), (3) bill padding, and (4) an attempt to collect an unconscionable fee or cost in violation of Rule 4-200 of the Rules of Professional Conduct.

### 15.   Contract Attorneys

Another recurring complaint in fee disputes concerns charges for the use of contract attorneys. Lawyers use contract attorneys for a myriad of purposes, including court appearances, conducting legal research, drafting motions or appeals briefs, etc. The resulting complaints typically concern how much the client is ultimately charged for these tasks. The ABA has opined that, if properly disclosed, it is appropriate for the lawyer to mark-up the cost [or add a profit] for work performed by contract attorneys. (*See* American Bar Association Standing Committee on Ethics and Professional Responsibility Formal Opinion 00-420, Surcharge to client for use of a contract attorney (November 29, 2000)). However, disputes result when a lawyer chooses to use a "contract attorney" and then bills for the work performed as a fee at the lawyer's hourly rate, when, in fact, the lawyer is paying the contract attorney a lesser rate.[5]

Anticipated use of contract attorneys should be addressed in the written fee agreement. The written fee agreement should state whether the contract lawyer is billed out as a cost or their time is charged as a fee at indicated rates along with the time of the lawyer's or law firm's other timekeepers (partners and associates). (*See* State Bar of California Standing Committee on Professional Responsibility and Conduct, Formal Opinion No. 2004-165; and The Professionalism and Ethics Committee of the Orange County Bar Association, Formal Opinion 2014-1). Absent such disclosure, the client should only be charged the out-of-pocket cost of the contract attorney.

---

[5]       There are numerous other non-billing, ethical considerations that are triggered by the use of contract lawyers. As COPRAC concluded in its Opinion 2004-165: Contract attorney services, and individual lawyers providing contract legal services to lawyers, may provide cost-effective alternatives to consumers of legal services. In using these services, those lawyers hiring the contract attorneys must comply with the ethical rules concerning the disclosure to the client of significant developments in the representation. Both those lawyers doing the hiring and those lawyers who are hired must comply with the ethical rules concerning competence, confidentiality, advertising, and conflicts of interest that apply to their respective roles in any such arrangement.

For example, assume that a lawyer [a solo practitioner], charging her client $300/hour, is unable to attend a status conference. She engages a contract attorney to attend a status conference. The contract attorney then delivers an invoice to the lawyer indicating that it took him 1½ hours to attend the status conference and the cost to the lawyer is $100, which the lawyer pays. Generally, given the foregoing facts, the client should only be charged the $100 paid to the contract attorney. If the lawyer seeks to charge the client some other amount, more than $100 or $450 (1½ hours it took to attend the status conference multiplied by her $300/hour rate), it must be clearly disclosed in the written fee agreement. If it is not, then it may be evidence of bill padding.

However, there are circumstances where the facts are not so clear-cut. For example, some law firms [including large multi-national law firms], occasionally find it necessary to hire groups of contract attorneys to conduct special assignments, like document reviews in large cases involving hundreds of thousands, if not millions, of hard and digital documents. In addition to the hourly rate for the contract attorneys, such law firms also incur office and transportation [and other] costs associated with using the contract attorneys. For example, the law firm may have to allocate a portion of their office space, or rent some additional office space, for the contract attorneys to do their work. In such cases, assuming that the use and charge of the contract attorneys are properly disclosed in the written fee agreement, it may be appropriate for the law firm to charge a premium for the use of the contract attorneys. If there is no such disclosure, in addition to the contract attorney's actual hourly rate, the law firm may also be able to properly charge the client for the associated costs described above. Of course, in such circumstances, it is the law firm's obligation to bear the burden of proof to quantify the associated costs chargeable to the client.

The arbitrator should consider the terms of the written fee agreement and whether the client agreed to pay for contract attorneys at some rate other than the actual cost to the lawyer. In the vast majority of written fee agreements, the term "attorney" or "lawyer" is typically defined to mean only the lawyer and/or law firm hired by the client. While a reasonable extension of this definition may include the defined lawyer's employee associates and partners, it does not necessarily include non-employee contract attorneys to which the client has no relationship. Accordingly, the arbitrator should assess those facts regarding whether the client agreed or acknowledged the use and expense of contract attorneys.

## CONCLUSION

The vast majority of lawyers are honest and their bills are reliable statements of the work and time billed to the client. However, if a client claims to have been over-billed, the arbitrator should, at the very least, (1) evaluate the specificity of the time entries and the process by which the fee bill was prepared, (2) evaluate the staffing used on the matter, (3) evaluate the work performed against the time billed, and (4) look for certain patterns in the descriptions of the work performed, including the time entries, to assess the accuracy and propriety of the time charged to the client.